OPINION OF THE COURT
Bertram R. Gelfand, J.
In this contested private placement adoption proceeding, petitioners seek the adoption of a nonmarital female child born on January 12, 1979. Petitioners are the infant’s natural mother and her husband, whom she married on September 8, 1984. The opposing respondent is the infant’s putative father. It is contended by petitioners that the consent of the putative father to the granting of the application is not required, since he does not fit within the criteria set forth in Domestic Relations Law § 111 (1) (d) and he is disqualified based on abandonment under section 111 (2) (a).
Counsel was assigned to represent the putative father who is indigent and incarcerated in State prison (see, SCPA 407 [1] [in]). Respondent was present at the hearing and fully participated in the proceeding.
The natural mother and putative father first met in 1976. They subsequently cohabited for a period of approximately five years. The natural mother concedes that respondent is the father of the infant and that he was in an appropriate paternal relationship with the child from the time of the child’s birth until June 1981, when respondent departed from their abode. After this separation, the natural mother returned to reside with her mother. The proof indicates that from June 1981 to June 1983 the parties periodically reconciled. At the hearing, it was stipulated that petitioners’ allegations relative to Domestic Relations Law § 111 (1) (d) and § 111 *462 (2) (a) were limited to a period commencing in June 1983 and continuing to the present time.
It is not disputed that in June 1983 respondent absconded from the County Court, Rockland County. At that time the female petitioner was also on parole awaiting sentence on charges arising from the same incident. On or about July 15, 1983, the then fugitive respondent telephoned petitioner and requested that she and the child join him in Chicago, Illinois. The natural mother rejected this request, indicating that life as a fugitive would hardly provide an appropriate setting for raising the infant. On that occasion, petitioner also threatened to report respondent to the authorities if he came to her home.
Respondent remained a fugitive until January 1985, when he was apprehended for an unrelated crime in the State of Oregon. He was subsequently returned to New York. On April 9, 1985, respondent was sentenced to a term of imprisonment of from two to four years. He is presently serving this sentence.
Respondent testified that he fled the jurisdiction motivated by a fear of being sent to State prison. All of respondent’s prior incarcerations were in county or local jails.
During the 18-month period in which respondent was a fugitive, he lived in various cities throughout the country. For approximately seven months of this time, he was gainfully employed on an itinerant basis as a painter and earned approximately $200 to $300 per month. Respondent allegedly remained in continual contact with his mother through telephone calls on at least a weekly basis. During the long intervals in which respondent was not regularly employed, he contended that he survived on funds sent to him by his family. Respondent conceded that, while he was a fugitive, he never sent any funds whatsoever for the support of the infant, nor did he ever request that his family provide funds for the infant’s support. He further conceded that, after petitioner refused to join him in Chicago, he gave no consideration to any plans involving the care of his daughter. His only present plan is that he would like to have rights of visitation with the infant after his release from prison. At no time did respondent ever send any cards, gifts, or support to the infant while he was a fugitive. Essentially, the putative father ascribes his failure to visit the infant, or otherwise be involved in her life while a fugitive, to the natural mother’s threat to inform the authorities of his whereabouts.
*463 Respondent also testified to a telephone call which he made to the home of the infant’s maternal grandmother between the hours of 1:30 and 2:00 a.m. on August 28, 1983. He alleged that, during this telephone call, he expressed a desire to speak with his child. The maternal grandmother’s testimony alleges that the substance of this telephone call was a threat to the life of the natural mother.
Respondent introduced into evidence a letter he wrote to the maternal grandmother dated April 5, 1985. This communication was written after respondent’s apprehension and subsequent to the commencement of the within proceeding. This letter is limited to respondent expressing a desire to have a photograph of his daughter and an avowal that he has no intention of interfering in the family life of petitioners and the infant in any way. In essence, the letter asks for a momento of respondent’s paternity and constitutes a disavowal of any intent to be otherwise involved in the infant’s life. The totality of this letter is more damning than supportive of respondent’s opposition to the instant application.
The infant’s paternal grandmother testified that, during the 18-month period that her son was a fugitive, he regularly called her on the telephone and in these conversations would inquire about the infant. It was alleged by the paternal grandmother that she always assured him that she was in regular contact with the infant and that the infant was well. Actually, the paternal grandmother had no contact with the infant. That she was in fact not in contact with the infant she attributed to petitioner not permitting her any visitation. Even if her testimony on this subject were given credence, it reflects no more than a faint initial effort to see her granddaughter after her son’s departure, followed by an abandonment of any further meaningful effort or interest after an initial rebuff. Her account of her efforts to be involved in her granddaughter’s life fell far short of the interest of a truly concerned grandparent.
The consent of the putative father of an infant placed for adoption after the age of six months is not required unless, at the threshold, he satisfies the criteria set forth in Domestic Relations Law § 111 (1) (d) (Matter of Andrew Peter H. T., 64 NY2d 1090). Pursuant to this statute, respondent’s consent would be required if he had maintained substantial and continuous contact with the infant as manifested by providing support for the child that was reasonably within his means *464 and either visiting the infant at least monthly when physically and financially able to do so and not prevented from so doing by the party having custody of the infant, or regularly communicating with the child in the event that he was prevented from visiting by his own physical or financial condition.
The basic question presented is whether respondent’s status as a fugitive constituted justification for his failure to support, visit or contact the child. Within the framework of this issue, consideration is given to the contention that, at least as to lack of contact, the natural mother refused to accompany respondent with the child in his fugitive status and that, had he visited the child, the natural mother might have advised the authorities as to his whereabouts. On the latter subject, it must be noted that, at the time when the mother of the child refused to accompany respondent with the child, not only would she be subjecting the child to the life-style of a fugitive from justice, but this would have encompassed her personally becoming a fugitive from justice. At the time, her status in relation to the criminal justice system was similar to that of the respondent.
To embrace the position of respondent would require a conclusion that absenting oneself from the life and support of his or her child is justified if it is motivated by a desire to escape lawful incarceration. Neither public policy, logic, nor the fundamental best interests of an infant can conceivably sustain respondent’s position. It is clearly offensive to public policy to relieve a parent of the fundamental criteria set forth in Domestic Relations Law § 111 (1) (d) because a parent finds such a course necessary in order to evade lawful incarceration. In those cases where a parent is prevented from visiting or supporting a child by dint of lawful incarceration, the circumstances preventing both support and contact flow from an act of the State. However, when such omissions are a product of the parent opting to become a fugitive by absconding while on parole, the omissions flow from the parent choosing to forego parental responsibility and involvement by giving a higher priority to his own unlawful flight. That respondent’s position is contrary to both logic and the best interest of the infant is evident from the facts in this very case. Respondent’s fugitive status terminated, after approximately 18 months, only as a result of his arrest in the State of Oregon for a new crime. Were it not for this circumstance, respondent might have continued to be a fugitive into the *465 indefinite future. If respondent’s position were to be embraced, a parent who is successful in remaining a fugitive from justice throughout the entire minority of his child could succeed in leaving the infant’s status in a constant state of limbo in which she would be divorced from her natural father to the same extent as if he were dead and she would nevertheless be precluded from being incorporated into an adoptive circumstance which would permit her development in an appropriate family setting. Respondent’s alleged request of his mother to see the child cannot, even if given credence, serve as a substitute for the statutory necessity of himself being in contact with the child and providing support. It is noted that, although respondent earned reasonable amounts of money at different stages of his fugitive status and prevailed upon his mother to support him when he was in need, at no point did he forward any portion of his own earnings for the support of the infant, nor did he request that his parents supply funds for the needs of the infant. Respondent initially abdicated all concern for the infant to the natural mother, and thereafter to the natural mother and her husband. His present degree of interest in the infant and his "plans” for the infant’s future at this time do not rise above the level, at best, of casual interest and a desire to visit with the child on occasion.
The refusal of the natural mother to subject the infant to a life of accompanying a father who is a fugitive from justice cannot be accepted as a basis for concluding that the failure of respondent to have visited and supported the infant is attributable to the acts of the petitioning mother. Nor can it be concluded that being a fugitive serves to toll the threshold requirement of meeting the criteria set forth in Domestic Relations Law § 111 (1) (d) (Matter of Andrew Peter H. T., supra). Respondent’s fugitive status having failed to exculpate him from the ramifications of his omissions, it is concluded that he has not met the threshold criteria needed to require his consent to the adoption of the infant.
This conclusion renders it unnecessary to reach the issue of whether respondent’s consent should be dispensed with on the grounds of abandonment. However, were the court required to reach this issue it would conclude that the totality of the evidence clearly and convincingly establishes that respondent abandoned the infant within the meaning of Domestic Relations Law § 111 (2) (a) and such abandonment would independently warrant dispensing with the necessity of his consent to the granting of the application (see, Matter of Corey L v *466 Martin L, 45 AD2d 383). That the abandonment may have been to facilitate embracing the status of a fugitive from justice does not, in any respect, vitiate the implications flowing from respondent’s completely divorcing himself from support, responsibility and even meaningful concern for the infant.
Evidence was also adduced with reference to the best interests of the child. It established that the infant’s mother has been drug free since participating in a drug program as part of her sentence of probation for the criminal charges she faced jointly with respondent. Since those charges, she has been free of conflict with the law. She and her husband currently live in a well-furnished, five-room apartment in Bronx County in which the mother is functioning as a responsible mother and wife. The male petitioner has been gainfully employed for a period of 18 months as a bus driver for a public authority and earns approximately $28,000 per year. Although he has had a previous history of drug abuse, the male petitioner has been completely drug free since 1984. He impressed the court as presently being a stable and responsible individual who is now living a respectable, responsible and structured life with his wife and her child. In contrast, the putative father, even during the period in which he cohabited with the natural mother, had, at best, an intermittent history of employment. His education terminated at the ninth grade level. His only gainful employment was sporadic work as a painter. Upon the totality of the proof adduced, the best interests of the child clearly lie with the granting of the adoption application.
Accordingly, upon the basis of the foregoing determinations, petitioners are hereby directed to appear in room 406 on the 19th day of December 1985 at 9:30 a.m., for such further proceedings as are appropriate to complete the application.