*727 OPINION OF THE COURT
Joyce L. Sparrow, J.
This court has pending before it the petition of the natural mother and her husband to dispense with the consent of the respondent putative father to an adoption of the child born in Texas on February 4, 1986. In August 1986, the respondent moved for an order of filiation, which was granted on consent. Subsequently, a limited order of visitation was granted subject to this court’s decision in the within adoption.
The facts are as follows: The natural mother and respondent dated and planned to marry in 1984. More than one ceremony was canceled. After learning she was pregnant in June 1985, the mother spent a few days each with the respondent and his mother, because her parents would not allow her to return home. She then left for Texas to reside with her sister and brother-in-law. During her stay there she resumed a high school friendship with the copetitioner, who was in the Armed Forces and based nearby. The mother wrote to and called the respondent soon after arriving in Texas. She provided him with both her address and telephone number, but received no immediate communication. In early December, the mother’s future husband began living with her at her sister’s home and he assumed financial responsibility for the mother (including her prenatal care), purchased furniture for the baby, and attended natural child birth classes with the mother. In all respects, both before and after the baby’s birth, the stepfather assumed familial responsibilities for the mother and her child, including placing his name on the baby’s birth certificate as father. The mother did not communicate directly with respondent after the baby was born, although he was informed of the birth.
Late in April 1986, the mother returned to New York to reside with her parents, obtain employment, and prepare for her future husband’s forthcoming discharge from the Army in December 1986. Respondent and his friends were led to believe that the petitioners were already married. Before August 1986 when they were legally married, the stepfather visited the mother and child for a week at a time.
From April 1986 (when the mother returned to New York) until the August paternity petition, respondent made some efforts to communicate with her. Sometime during that spring the mother sought and was granted an order of protection against respondent for his alleged harassment.
The mother’s credible testimony was that she left for Texas *728 in July only because respondent was angry with her, insisted she obtain an abortion, and wanted nothing to do with her. She further testified that respondent continued to be unresponsive even after her repeated attempts at communication. This led to her conclusion that respondent was neither interested in her nor her baby.
Respondent’s testimony was incredible and replete with inconsistencies and self-serving statements. His explanation for his actions in the summer and fall of 1985 are unconvincing. He made no efforts to offer assistance or support. He did not propose marriage, or in any other way indicate his inclination to assume responsibility for either the mother or the baby. His testimony repeatedly referred to the mother’s parents’ hostility towards him, but failed to show how that prevented him from assuming responsibility while the mother was pregnant. Nor was his failure to pay maternity costs, hospital bills, or send money or gifts to the child explained. The parents’ hostility towards respondent had always existed, but the mother had evinced a clear intention to marry the respondent in spite of their objections. The respondent was employed or received unemployment benefits while also working in a family business during the entire relevant period.
After the child was born the mother acknowledged that she no longer wished to communicate with respondent. It was only while the mother was geographically closer that respondent made any genuine attempt at communication. The evidence suggests that even then the respondent’s harassing behavior demonstrated jealousy of her new relationship, and a desire to renew a relationship with the mother, rather than a genuine interest in his child. Respondent does not explain why he did not pursue a more appropriate course of conduct which could have resulted in visitation with the child. He never made any effort to offer support for the baby, and the small sum of money he gave the mother was a return of her own contribution to a joint account. Even after the court ordered visitation, respondent failed to meet the requirements of the order.
The threshold question is whether respondent has achieved the status of a father entitled to withhold his consent to an adoption. The New York State Legislature amended Domestic Relations Law § 111 (L 1980, ch 575, §§ 1-3) in response to the holding in Caban v Mohammed (441 US 380 [1979]). The amended statutory scheme has been found constitutional by the United States Supreme Court in Lehr v Robertson (463 US 248 [1983]). In a trilogy of cases, Quilloin v Walcott (434 US *729 246 [1978]), Caban v Mohammed (supra), and Lehr v Robertson (supra), the United States Supreme Court has made it clear that when unwed fathers have manifested a significant paternal interest in the child, their consent to an adoption may be required (Caban v Mohammed, supra). However, when such a father demonstrates no significant responsibility with respect to daily supervision, education, protection or care of the child, consent will not be required (Quilloin v Walcott, supra). A biological link without coming forward to assume parental responsibility is insufficient (Lehr v Robertson, supra).
The New York statute embodies the foregoing philosophy (Matter of Andrew Peter H. T., 64 NY2d 1090 [1985]). The amended language in Domestic Relations Law § 111 distinguishes between children placed during their first six months of life (Domestic Relations Law § 111 [1] [e]) and those placed after six months (Domestic Relations Law § 111 [1] [d]). A putative father must demonstrate that he meets the criteria contained in each subdivision depending on when the child was placed with adoptive parents. The statute takes into consideration the differences that exist when a child lives with its adoptive parents almost from birth as opposed to when a substantial time passes during which a father may establish and maintain an independent relationship with his child if placed more than six months after birth (Domestic Relations Law § 111 [1] [d], [e]).
Although Domestic Relations Law § 111 applies to private adoptions, this court could find no definition of the term "placed” when applied to private adoptions. In an agency adoption, placement is defined by the Social Services Law § 371 et seq. and accompanying regulations. These definitions have no relevance to private adoptions and even less to private stepparent adoptions. An adoptive couple who acquires a child privately, generally assumes that placement occurs when the child begins to reside with them, and any residency requirements will be calculated from that time (Domestic Relations Law § 112 [6], as applied in § 115 [1]). In order to adopt, the adoptive parents must also meet the statutory eligibility requirements (Domestic Relations Law § 110).
Arguably, the child was placed with her adoptive father at birth, since he assumed all responsibility for her at that time. Indeed, his parents still believe he is in fact her natural father. Since he was not married to the child’s mother until a little over six months later, however, he may not have been eligible to adopt her. Certainly, the question of the stepfa *730 ther’s rights to adopt the child before he married the mother is unclear. It is also unclear whether for placement to occur the stepfather had to demonstrate his eligibility to adopt. One reported decision holds that a father may adopt a child without marrying the mother and without depriving her of her legal relationship to the child and the statute does not appear to preclude such application (Matter of A. J. J., 108 Misc 2d 657 [1981]; Domestic Relations Law § 110).
This case poses the unique issue of when placement is deemed to occur in a stepparent adoption. Until the Legislature clarifies the ambiguity in the statute regarding the term "placed”, it will remain impossible to determine which subdivision of Domestic Relations Law § 111 applies to this fact pattern. Accordingly, both relevant subdivisions must be considered.
If the child is placed before six months of age, a putative father must meet all the following criteria: "(i) such father openly lived with the child or the child’s mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in connection with the mother’s pregnancy or with the birth of the child.” (Domestic Relations Law § 111 [1] [e].)
If placed after six months, then the requirements are: "such father shall have maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum, according to the father’s means, and either (ii) the father’s visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father’s regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child. The subjective intent of the father, whether expressed or otherwise, unsupported by evidence of acts specified in this paragraph manifesting such intent, shall not preclude a determination that the father failed to maintain substantial and continuous or repeated contact with the child. In making such *731 a determination, the court shall not require a showing of diligent efforts by any person or agency to encourage the father to perform the acts specified in this paragraph. A father, whether adult or infant, of a child born out-of-wedlock, who openly lived with the child for a period of six months within the one year period immediately preceding the placement of the child for adoption and who during such period openly held himself out to be the father of such child shall be deemed to have maintained substantial and continuous contact with the child for the purpose of this subdivision.” (Domestic Relations Law § 111 [1] [d]; emphasis added.)
The respondent does not meet the three criteria contained in Domestic Relations Law § 111 (1) (e). He never lived with the mother or child, nor made any contribution to the mother’s medical, hospital or nursing expenses (Matter of "Female” D., 83 AD2d 933 [2d Dept 1981]; Matter of Michael Patrick C., 83 AD2d 932 [2d Dept 1981]). Other than the fact that in this case the adoptive couple is the natural mother and her husband, the facts here are almost identical to those in Matter of Michael Patrick C. (supra). The father of Patrick C. also urged an abortion and clearly valued his relationship with the mother more than with his child. That child was cared for by the adoptive parents from birth and, likewise, this child’s stepfather assumed responsibility for her even before her birth. The court in Patrick C. stated: "Where an unwed father has failed to provide this stability and support, as evinced by compliance with the requisite statutory criteria, it is in the interests of the infant, of the society in which the infant will live, and of the unwed mother, if she consents, to have the child adopted into a home where such stability and support will be provided.” (Matter of Michael Patrick C., supra, at 933.)
The respondent also does not meet the requirements of Domestic Relations Law § 111 (1) (d). Commencing from the time that the mother informed the respondent about her pregnancy and subsequently when the child was born, the respondent’s efforts to establish a parental relationship were either counterproductive or feeble, at best. No substantial or meaningful contact was ever established. There was no support and virtually no visitation. Even when the court granted visitation, respondent only partially complied with that order. Notwithstanding that some obstacles were placed in respondent’s way, he nevertheless failed to demonstrate any genuine effort to overcome them (Matter of Amanda R. M., NYLJ, *732 July 10, 1986, at 12, col 3; Matter of Jennifer R. C., 130 Misc 2d 461 [1985]; and see, Matter of Lisa Marie F., 110 AD2d 993 [3d Dept 1985] [this case analyzes the similar requirements of Domestic Relations Law § 111 (2) (a)]). The mother’s move to Texas was motivated by respondent’s hostility to the pregnancy. Therefore, respondent was the prime cause of this one major obstacle, the mother’s change of residence. There is no statutory obligation imposed upon the mother to assist the respondent in either establishing or maintaining contact with his child. He was capable of doing more than he did to establish a relationship with his child. Respondent’s statements of intent are simply belied by his actions. The court in Matter of Catholic Child Care Socy. (112 AD2d 1039, 1041 [2d Dept 1985]) said succinctly: Domestic Relations Law § 111 (1) (d), (e) "only requires the consent of those fathers of children born out of wedlock who have established a substantial relationship with the child”. He failed both to establish such a relationship or adequately explain his failure to do so.
Since respondent has failed to meet the threshold requirements of Domestic Relations Law § 111 (1) (d), (e), it is unnecessary for the court to reach any other issue and it determines that respondent lacks the standing to oppose petitioner’s application to adopt the child (Matter of Andrew Peter H. T., supra; Matter of Terry DD., 105 AD2d 955 [3d Dept 1984]).
Petitioners will be notified by the adoption clerk of the date to appear for such further proceedings as are appropriate to complete their application. Visitation shall cease immediately.