640 A.2d 1085

In re ADOPTION/GUARDIANSHIP NO. A91–71A in the Circuit Court For Anne Arundel County.

No. 113, Sept. Term, 1993.

Court of Appeals of Maryland.

May 9, 1994.

Paul Mark Sandler (Lloyd J. Snow, Freishtat & Sandler, all on brief), Baltimore (Natalie H. Rees, Rees and Boyd, P.A., all on brief), Towson, Rignal W. Baldwin, Jr. (Deborah M. Levine, Brassel & Baldwin, P.A., all on brief), Annapolis, for petitioner.

Roger A. Perkins, Annapolis, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and BELL, JJ., and CHARLES F. ORTH, JR., Associate Judge of the Court of Appeals* (retired), Specially Assigned.

MURPHY, Chief Judge.

This case involves a contested independent adoption proceeding, namely, an adoption not arranged by a child placement agency but rather by and between a biological parent and prospective adoptive parents. A threshold issue in the case is whether a court must appoint separate counsel for a child who is the subject of an independent adoption. Another primary issue requires that we address the proper application

---

* ORTH, J., retired, and specially assigned, participated in the hearing of this case but died prior to the adoption and filing of this opinion.

of the best interest standard in terminating the rights of a natural parent who contests the independent adoption.

Maryland Code (1984, 1991 Repl.Vol., 1993 Cum.Supp.) § 5–323 of the Family Law Article provides:

"(a) —In a proceeding for an adoption or guardianship, the court shall appoint separate counsel to represent:

\*      \*      \*      \*      \*      \*

"(4) in an involuntary termination of parental rights, an individual who is the subject of the proceeding and an indigent parent...."

Maryland Code (1984, 1991 Repl.Vol.) § 5–312 of the Family Law Article is applicable to independent adoptions in which a natural parent affirmatively withholds consent by filing a notice of objection. Subsection (b) provides that a court may grant a decree of adoption without a natural parent's consent if the prospective adoptive parent has exercised physical care, custody, or control of the child for at least 6 months, and if the court finds, by clear and convincing evidence, that:

"(1) it is in the best interest of the child to terminate the natural parent's rights as to the child;

"(2) the child has been out of the custody of the natural parent for at least 1 year;

"(3) the child has developed significant feelings toward and emotional ties with the petitioner;  and

"(4) the natural parent:

"(i) has not maintained meaningful contact with the child during the time the petitioner has had custody despite the opportunity to do so;

"(ii) has repeatedly failed to contribute to the physical care and support of the child although financially able to do so;  or

"(iii) has been convicted of child abuse of the child."

I

Ernest M. and Mellisa R., both unmarried, began to live together in early June of 1990. Toward the end of July 1990,

Mellisa discovered she was pregnant with Ernest's child. At the time, Mellisa was 20 years old, a dancer on Baltimore's "Block" and had a six-month-old child from a previous relationship. She had no family in Maryland and was receiving financial assistance from the State. Ernest was 21 or 22 years old. Mellisa informed Ernest that she was pregnant and, because she could not care for another child and did not believe in abortion, that she planned to put the child up for adoption. According to Mellisa, Ernest expressed no opinion as to her adoption plans, but responded to the information that she was pregnant by moving out of her apartment the following evening while she was at work, and then stopping by her place of employment to inform her that he had moved. Ernest then moved back to his grandmother's house, where he had previously been living.[1] Mellisa testified that Ernest never expressed any interest thereafter in her or the pregnancy and offered her no financial assistance.

Mellisa met the prospective adoptive parents, James and Darlene D., through a mutual acquaintance, and decided that she wanted them to adopt her child. The D.'s arranged to pay for Mellisa's prenatal and postnatal medical care.

In January and February 1991, Mellisa's attorney contacted Ernest with regard to the upcoming birth and plans for adoption. Ernest indicated in a telephone conversation with Mellisa's attorney that he was willing to consent to an adoption. He said, "If the bitch wants to give it away, she can." Subsequent correspondence between Mellisa's attorney and Ernest, dated February 12 and 18, confirmed Ernest's expressed willingness to consent.

Ernest subsequently changed his mind and engaged counsel who informed Mellisa's attorney that he would not consent to the adoption. This change in Ernest's mind-set apparently

---

1. Ernest testified that he did not move out because Mellisa was pregnant but because the relationship had lost its "excitement" and the two had "drifted apart." He claimed that he believed Mellisa was going to have an abortion and that he did not find out otherwise until he saw Mellisa at a party in late 1990.

occurred after Mellisa spoke with Ernest's mother, Margaret H., and informed her of her pregnancy by Ernest and of her plans to place the child with the adoptive parents.

On March 16, 1991, the child, a boy, was born. Mrs. D., one of the prospective adoptive parents, was present at the birth. Two days later, with Mellisa's consent, the D.'s filed in the Circuit Court for Anne Arundel County a Complaint for Independent Adoption and Change of Name. On the same day, the court signed an order granting temporary custody of the child to the D.'s, and the couple took the baby (Baby G.) home from the hospital. Also on March 18, the court issued a Show Cause Order requiring Ernest, if he intended to object to the adoption, to file a Notice of Objection on or before April 10, 1991.

On April 9, Ernest filed a Notice of Objection, requesting proof that he was actually Baby G.'s biological father and indicating that he would seek custody if the child was his. He subsequently filed a petition asking that blood testing be conducted to determine paternity. As he later testified, Ernest hoped that the test would establish that he was not the father, so that he would be "off the hook." The test results, however, established that Ernest was the biological father of Baby G.

In the meantime, Mellisa filed a Conditional Revocation of Consent to Independent Adoption, stating that if the court would not finalize the adoption over Ernest's objections, she would revoke her consent to the adoption and assume Baby G.'s care and custody herself.

On June 28, Ernest filed a Petition for Custody of the child. On July 15, he filed an *ex parte* Petition for Visitation, which was denied.

The court ordered an investigation of the natural parents, which was conducted by Carol Popham, a social worker employed by the Anne Arundel County Department of Social Services. At the time of this investigation, Ernest was living with Beth W., who, according to testimony, was a prostitute on the "Block." Ernest told Popham that he and Beth W. were

committed to their relationship and would raise the child together if Ernest were granted custody. But, less than a month later, Ernest called Popham to tell her that he and Beth W. were no longer together because he "did not believe that [she] would be a good influence over his son." Ernest informed Popham that he would now be living at his grandmother's house and that his mother, Margaret H., who lived with her husband elsewhere, would live at his grandmother's house Monday through Friday and would change her work schedule so that she could care for the child during the day while Ernest was at work. However, there was no assurance that she would, in fact, be able to change her work schedule and, even if she were able to do so, it appeared that there would be a gap in time between her schedule and Ernest's in which a third caregiver would be necessary. The social worker expressed the belief that Ernest's "sudden interest" in obtaining custody of the child was due to his mother's influence. In addition to questioning Ernest's commitment to Baby G., she cited behavior by Ernest which she considered irresponsible, including excessive absences from work, numerous points on his driving record, and an arrest and probation before judgment for cocaine possession. She recommended that the D.'s adoption petition be granted.[2]

A hearing on the merits was set for October 10, but a continuance was granted because Mellisa's attorney was not available on that date, and the case was reset for March 6, 1992. Ernest moved for an emergency hearing and filed a

---

**2.** Popham also conducted an investigation of the adoptive parents and concluded that they could "more than provide adequately" for Baby G., that they had given the child "excellent care," and that they were "committed" to Baby G., who was described as a "happy, active baby." The D.'s had been married for approximately 15 years and had no children. Mr. D. was a 38–year–old construction supervisor who had worked in the construction business for 17 years. Mrs. D., 37 years old, was a graduate of the University of Maryland and was employed by a local company as a manager of service representatives. They owned their own home, had good employment histories and were financially secure. They had arranged for a friend and neighbor to watch the baby in their home while they were at work. Mrs. D. took leave from work to be home during the baby's first three months.

Motion to Dismiss the adoption petition. The case was reset for December 13, 1991. On that day, the court (Lerner, J.) heard evidence on the issues of custody and visitation, as well as Ernest's motion to dismiss. In a December 20, 1991 order, the court held:

1. that while it would not dismiss the adoption petition, it would not enter a decree of adoption because it did not have the authority to do so at that time;

2. that it would not be in the child's best interest to grant visitation or custody to Ernest and that therefore visitation was denied; and

3. that the D.'s would continue to have custody of the child, pending the completion of the adoption proceedings.

In so concluding, the court said:

"[The] [i]ssue for me today is [the] issue of custody.... The rights of the parents ... are not absolute, but are subject to the best interest of the child.... And the right that a parent has to custody and rearing of his children is not an absolute one, but one that may be forfeited by abandonment, unfitness of a parent, or where some exceptional circumstances render[ ] the parent[']s custody of the child detrimental to the best interest of the child.

"And ... I find that [Ernest's] background would be detrimental ... and I'm not [going to] give him custody of that child today. He's what you call a Johnny-come-lately. He ... says to [Mellisa] who[m] he lives with and fathers the child, that it's not his child. Prove it. Moves out on her. Leaves her destitute ... for months ... and shows up on the day that she gives birth to the child with his girlfriend.

"His background, while you've been nice about calling these girls dancers, they're strippers on the Block. That background is extremely poor for that child.

"The language. He says, 'if that bitch wants to keep the child, she can.' That's his attitude towards the child.

\* \* \* \* \* \*

"We've got to have stability in this child's background. And we're not [going to] have it giving that child to [Ernest].

\* \* \* \* \* \*

"[The social worker] had an opportunity to make an in depth study in this case. . . . [Ernest] objected to being the father of the child and he had to have a lab report to prove it to him. He lived with one Beth [W.] He's just been living here and there. And there's just no stability there. In summary she says, 'One must evaluate [Ernest's] commitment to this child. I believe [Ernest's] sudden interest in this child is due to his mother's direct influence. Should he obtain custody, Mrs. [H.] will become the child's primary care-taker.'

"And I really believe that's so. Mrs. [H.] has already volunteered herself, with unknown consequences for her job and marriage.

" 'I believe my investigation leaves one to be uncertain of [Ernest's] future behavior and role as a parent to this child. His past behavior shows irresponsibility and poor judgment with his job, the law and his relationship with [Mellisa R.] and [Beth W].' "

"I'm going to grant custody to Mr. and Mrs. [D.] And there's to be no visitation because it's just [going to] totally disrupt that child. It's not in the best interest of that child."

### The Hearing on the Merits of the Adoption

The hearing on the merits of the adoption was held April 27–29, 1992. After testimony was adduced relevant to whether, under § 5–312, the independent adoption would be granted without the consent of the natural father, the court (Wolff, J.), by order dated May 4, 1992, denied the D.'s petition for adoption, but ordered that custody of Baby G. be continued with the D.'s. The court stated that, as to § 5–312, the following had been proven by clear and convincing evidence:

1. that the D.'s had exercised custody of the child for at least six months;

2. that the child had been out of the custody of Ernest for at least one year; and

3. that the child had developed significant feelings toward and emotional ties with the D.'s.

The court ruled, however, that it had not been proven by clear and convincing evidence that Ernest was unfit and therefore it could not find that it was in Baby G.'s best interest to terminate Ernest's rights as to the child. The court said:

> "We listed an argument to various things that we could consider under what would be in the best interests of the child; namely, pertaining to the fitness of the father. . . . It was pointed out that we have to look at a number of things, that taking them individually they may not be too bad. But the sum total, it's argued by counsel for the Petitioners and for the mother, that the father is not fit."

The court then reviewed the evidence introduced by the D.'s and Mellisa, including Ernest's driving record, the drug possession charge, his employment record, a history of instability in living arrangements, the weaknesses in his child care plan, his association with individuals employed on the Block, evidence of poor judgment regarding his relationships with Mellisa and Beth W., and his abandonment of Mellisa when she became pregnant. The court concluded that, while it was clear that the D.'s would be ideal parents to Baby G., Ernest was the natural father and he had not been shown to be unfit by clear and convincing evidence.

The court ruled also that it had not been proven by clear and convincing evidence that Ernest failed repeatedly to contribute to the physical care and support of the child. Although neither Mellisa nor the D.'s had received any money from Ernest for medical expenses or the care of the child, the court noted that Ernest had testified that he offered to make payment to the D.'s. Ernest had produced in evidence two checks which he claimed to have given to his attorney to

tender on his behalf. The first check, dated August 21, 1991, was a personal check for $7,279.79, drawn from the account of his mother, Margaret H., and made out to "cash." The second check produced by Ernest was a copy of a cashier's check for the same amount payable to Ernest, and dated December 2, 1991. The check was not endorsed. Ernest testified that the money came from "savings of [his] family," in particular of his mother and grandmother. There was no evidence that Ernest tendered or made any contribution from his own funds, although he was employed at the time. He further testified that the checks were refused by the D.'s. The D.'s testified, however, that they did not receive any offer of money from Ernest or from anyone on his behalf, nor did they expect any. The court stated:

"So, after he was found to be the father, and I don't know whatever happened, he did offer to make payments. And we have monies that were withdrawn and that he gave to his counsel to tender. They may not have been tendered. I don't know what happened. No one produced the evidence. But according to him, he made an effort through counsel to make payments. No one ever asked any payments of him after he was established to be the father. As a matter of fact, Mr. [D.] said 'I didn't expect any money from him.'

"So, no requests being made, having offered to pay, I don't find, again by clear and convincing evidence, that he has repeatedly failed to contribute to the physical care and support of the child."

The D.'s filed a Notice for In Banc Review on June 10, 1992, pursuant to Article IV, § 22, of the Maryland Constitution and Maryland Rule 2–551; they raised the following questions:

1. Whether the trial court erred by failing to appoint counsel for the child in violation of § 5–323;

2. Whether, under § 5–312, the court erred by equating the best interest standard with Ernest's fitness; and

3. Whether the court erred in finding that Ernest had not failed repeatedly to contribute to the child's support under § 5–312(b)(4)(ii).

## The In Banc Hearing

Baby G. was represented by separate counsel for the first time at the in banc hearing. On November 4, 1992, the in banc panel (Duckett, Williams, and Rushworth, JJ.) held:

1. that although the failure of the trial court to appoint counsel for the child violated § 5–323, the child's interest had been "vigorously represented" by counsel since the trial court's judgment.

2. that the focus below on Ernest's fitness obscured the "paramount issue" of whether the adoption was in the child's best interest; that even if the court concluded that Ernest was not unfit, that finding alone did not require denial of the adoption petition; and, consequently, the trial court erroneously equated the best interest standard with the fitness of the non-consenting father, and its factual finding was therefore clearly erroneous on that issue.

3. that the evidence before the trial court was insufficient to support its finding that Ernest had not failed repeatedly to contribute to the child's physical care and support under § 5–312.

The in banc panel noted that the checks offered in evidence by Ernest at the trial were.from Ernest's mother, were made payable only to Ernest, and were never endorsed or tendered on behalf of Baby G. It concluded that the child's best interests would be served by granting the adoption. It accordingly reversed the trial court's judgment and remanded the case to that court with instructions to grant the decree of adoption.

Ernest appealed to the Court of Special Appeals, raising these questions:

1. Whether the in banc panel erred in holding that the trial court had erroneously determined that it could not find by clear and convincing evidence that it was in Baby G.'s best interest to terminate Ernest's parental rights;

2. Whether the in banc panel erred in directing the trial court to grant the adoption rather than remanding the case for retrial under the proper "best interest" standard;

3. Whether the in banc panel erred in holding that the trial court erroneously concluded that it could not find by clear and convincing evidence that Ernest had repeatedly failed to contribute to Baby G.'s physical care and support; and

4. Whether the trial court and in banc panel erred in the application of the timing requirements of § 5–312(b).

## *The Court of Special Appeals*

In an unreported opinion, the Court of Special Appeals held that the in banc panel, as an appellate tribunal, could not make an independent finding as to the child's best interest. On the record before it, the intermediate appellate court concluded that "it is unclear whether the trial court errantly equated the best interest standard with ... [Ernest's] fitness ... or whether the trial court was merely (and permissibly) focusing its attention on the only 'best interest' argument made by counsel ... thereby ... implicitly indicat[ing] that it found no 'exceptional circumstances.'" As to this, the Court of Special Appeals observed that even though the trial court concluded that Ernest was not unfit, that finding alone would not require denial of the petition for adoption because a natural parent's right may also be forfeited where some exceptional circumstances render the parent's custody of the child detrimental to the child's best interests. The court then said:

"Absent any clear indication by the trial court as to the basis of its decision in this regard, we are unable to either affirm or reverse that court's decision. We must instead remand this case to the trial court for the purposes of clarification, to wit: if the trial court determines, by clear and convincing evidence based on the totality of the circumstances, that it is in the best interest of [Baby G.] to terminate [Ernest's] rights to the child, then the adoption petition may properly be granted *irrespective of [Ernest's]*

*fitness as a parent;* if, on the other hand, the trial court determines that the standard was not met, it must accordingly deny the petition." (Italics in original).

Further in its opinion, the intermediate appellate court opined that the record could not sustain a finding other than that Ernest had failed repeatedly to contribute to Baby G.'s care and support. It said that Ernest offered no evidence that the checks produced at trial were ever offered, or even made known, to the D.'s. The court also observed that the fact that the D.'s did not request or expect support would not, without more, relieve Ernest of his duty to support the child. The court determined that "even assuming, *arguendo,* that the checks allegedly tendered by [Ernest] to his attorney reflected some *desire* to 'contribute' to [Baby G.'s] 'physical care and support,' the record *sub judice* cannot (as a matter of law) sustain a finding other than that [Ernest] violated FL § 5-312(b)(4)(ii)." (Italics in original).

The court also addressed § 5-312(b)'s timing requirements. It interpreted the statute to control when the court had the power to grant an adoption, rather than when the adoption petition itself may be filed. The court indicated that, contrary to Ernest's contention, the D.'s were not precluded from filing their petition for adoption two days after the child's birth, even though the court could not grant the adoption until the statutory time requirements had been met. Because the trial court's decision was made after Baby G. had been in the D.'s custody for at least six months, and out of the custody of Ernest for at least a year, the Court of Special Appeals held that the statutory timing requirements had been satisfied. Not addressed in the intermediate appellate court's opinion was whether the trial court erred in failing to appoint separate counsel for Baby G. under § 5-323.

The D.'s, Mellisa, and Baby G. thereafter filed a joint petition for a writ of certiorari, asking that we decide whether "in an independent adoption—termination of parental rights proceeding, and in the circumstances of this case on remand to determine the best interest of the child, the child is required

to be represented by separate counsel, pursuant to ... § 5–323 and the child's constitutional right to due process of law."

In a cross-petition for certiorari, Ernest maintained that the Court of Special Appeals impermissibly modified or abrogated the statutory requirements which must be proven to grant an independent adoption without the consent of a natural parent by modifying the requirements of § 5–312 to create a "totality of the circumstances" test in determining when it is in a child's best interest to terminate the rights of the natural parent. Additionally, Ernest asked that we consider whether the Court of Special Appeals erred in ruling, as a matter of law, that Ernest had repeatedly failed to contribute to Baby G.'s care and support. And finally, Ernest asked that we consider whether § 5–312's timing requirements apply to the filing or to the granting of a petition for adoption. We granted both petitions for certiorari, 332 Md. 741, 633 A.2d 102, to consider the important issues presented therein.

## II

The D.'s, Mellisa, and Baby G. (the D.'s) argue before us that § 5–323 mandates the appointment of independent counsel for a child who is the subject of an independent adoption proceeding where termination of parental rights is at issue. They further assert that the constitutional requirements of due process, as well as public policy considerations, dictate the necessity for independent counsel in such a situation. They urge, however, that although the trial court erred in failing to appoint counsel, an entirely new trial is not required. They ask that we leave undisturbed the findings below as to the elements which have been established supporting a decree of adoption and that on remand to the trial court to determine the child's best interest, the child be represented by counsel.

Ernest urges that there is no statutory or constitutional requirement that separate counsel be appointed for a child who is the subject of an independent adoption proceeding where a natural parent does not consent. He argues that this issue is not properly before us because it was not raised in the

proceedings below. Moreover, he contends that § 5–323(a)(4) applies only to a proceeding under § 5–313 of the Family Law Article in which the State seeks to terminate a natural parent's rights. He suggests that there is a significant difference between a termination of parental rights proceeding brought by the State and an independent adoption proceeding involving only private parties. He urges that the adversarial nature of the termination proceeding brought by the State, with its vast prosecutorial resources, creates a necessity for counsel that does not exist in a proceeding involving a contested independent adoption. He states that "no practical purpose" would have been served by appointing counsel to represent Baby G.'s interests.

As to the application of the best interest standard in considering the termination of his parental rights, Ernest argues that the trial court properly applied the appropriate standard. He contends that the court considered the evidence offered as to his unfitness as the only evidence that had been offered relative to the child's best interest. He posits that when the court concluded that unfitness had not been proven by clear and convincing evidence, it necessarily held that the D.'s and Mellisa had not produced sufficient evidence to determine that it was in Baby G.'s best interest to terminate Ernest's rights. Ernest contends, therefore, that because unfitness was the only issue raised at trial, and no evidence was introduced as to exceptional circumstances, the Court of Special Appeals erred in holding that the adoption could be granted "irrespective of Ernest's fitness as a parent."

As to his failure to contribute to Baby G.'s care and support, Ernest asserts that there was substantial evidence to support the trial court's factual finding that he had not failed repeatedly to contribute to Baby G.'s care and support. He also suggests that because the adoptive parents neither requested nor expected support, they cannot now claim that he failed to contribute to the child's support.

And finally, Ernest argues that the trial court erred in not dismissing the adoption petition because, as he contends, it

was prematurely filed. He says that § 5–312's timing requirements relate to the filing, not the granting, of an adoption petition. Thus, he claims that the D.'s could not file the petition for adoption until Baby G. had lived with them for at least six months and had been out of Ernest's custody for at least one year. Because the D.'s filed the adoption petition before their cause of action for an independent adoption had accrued, Ernest concludes that their petition should have been dismissed. He strongly urges that delays in the judicial system should not operate to fulfill the statutory requirements and thereby permit accrual of the cause of action for the independent adoption. Such a result, he contends, deprives him of due process of law.

## III

### A

*The Child's Right to Counsel*

The issue of whether § 5–323 mandates the appointment of separate counsel for a child where the termination of a natural parent's singular right is sought in a contested independent adoption proceeding was neither raised nor decided in any of the trial court proceedings below. As earlier indicated, the matter was raised for the first time before the in banc panel, which stated that failure to appoint separate counsel for Baby G. violated § 5–323, but noted that subsequent to the trial proceedings Baby G. had obtained separate counsel to represent his interests and that they had been well represented. Ernest's appeal to the Court of Special Appeals did not raise as an issue the matter of appointment of counsel for Baby G. The question was, however, raised again in the D.'s certiorari petition.

■ Maryland Rule 8–131(a) provides that this Court "[o]rdinarily ... will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to

avoid the expense and delay of another appeal." As to the failure to raise the issue in the trial court, we shall hold, as we did in similar circumstances in *Wash. Co. Dep't Soc. Serv. v. Clark*, 296 Md. 190, 200, 461 A.2d 1077 (1983), that where, as here, the person for whose protection the statute was enacted is too young to have raised the issue in the absence of counsel, we may, in our discretion, address the issue. In the circumstances of this case, we choose to do so.

In *Clark, supra,* 296 Md. at 199–200, 461 A.2d 1077, we held that the failure to appoint counsel to represent the children of the appellee, whose parental rights the State sought to terminate under then Art. 16, § 76 of the Maryland Code, violated § 77B(a)(4) of that Article requiring the appointment of counsel for the child. This latter section was recodified without substantive change as present § 5–323(a)(4) of the Family Law Article, governing the appointment of counsel in termination of parental rights proceedings.

■ There is no merit in Ernest's contention that § 5–323(a)(4)'s mandate that counsel be appointed, "in an involuntary termination of parental rights, to represent an individual who is a subject of the proceeding" applies only to a proceeding brought under § 5–313 [3] and is not applicable to independent adoption proceedings brought under § 5–312. Ernest's position is unsupported by any reference to the statutory history of § 5–323 or its precursor, § 77B.

■ The cardinal rule of statutory construction is to determine the true intent of the legislature. *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993). We look first to the plain meaning of the language of the statute. *Id.* A plainly worded statute must be construed without forced interpretations designed to limit its application. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986). Section 5–323

---

**3.** Section 5–313 sets forth the requirements for the granting of a decree of adoption or guardianship without the consent of a natural parent in situations other than an independent adoption, that is, where a child placement agency seeks to terminate parental rights so that the child can be placed for adoption.

provides that in a proceeding "for an adoption or guardianship," separate counsel shall be appointed in an "involuntary termination of parental rights." The statute contains no language that would limit its application to only those proceedings brought under § 5–313. Moreover, both §§ 5–312 and 5–313 make explicit reference to a termination of parental rights.[4] Both set forth conditions prerequisite to the termination of parental rights and provide authority for the termination of rights once these conditions have been satisfied; thus, both sections govern termination actions. As we see it, for the purposes of § 5–323's applicability, there is no difference between a termination of parental rights prerequisite to the granting of an independent adoption and a termination of parental rights prerequisite to the granting of an agency-arranged adoption. In each instance, a parent's rights are irrevocably extinguished. *See* Joan H. Hollinger et al., *Adoption Law and Practice* § 4.04(1) (1993) (if an adoption can be granted without the natural parent's consent, and if the effect of the adoption is to terminate all legal rights and relationships between the child and the natural parent, the adoption proceeding is also a proceeding for termination of parental rights).

---

4. Section 5–312, which applies to independent adoptions, provides, in relevant part:

> (b) In general.—Without the consent of the child's natural parent, a court may grant a decree of adoption....

> \* \* \* \* \* \*

> (c) Considerations.—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child, the court shall request....

Section 5–313, which applies to adoptions other than independent adoptions, provides, in relevant part:

> (a) In general.—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent....

> \* \* \* \* \* \*

> (c) Required considerations.—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider....

Manifestly, the need for independent counsel to represent the interest of the child is just as compelling in an independent adoption as in an agency-initiated proceeding.

■ Because § 5–323 mandates [5] the appointment of counsel to represent Baby G. in the circumstances of this case, the trial court should have so ordered.[6]

## B

### *The Best Interest Standard*

Section 5–312 provides that a court may grant a decree of adoption without the consent of the child's natural parent if certain conditions exist, one of which is that the court must find, by clear and convincing evidence, that it is in the best interest of the child to terminate the natural parent's rights.

■ This "best interest" standard has long been the standard used in Maryland to decide contested adoption cases. *See, e.g., Clark, supra; Shetler v. Fink,* 231 Md. 302, 190 A.2d 76 (1962); *Winter v. Director,* 217 Md. 391, 143 A.2d 81, *cert. denied,* 358 U.S. 912, 79 S.Ct. 242, 3 L.Ed.2d 233 (1958). *See also* John S. Strahorn Jr., *Adoption in Maryland,* 7 Md. L.Rev. 275, 297–98 (1943). The same standard applies in contested custody cases. *See Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977). This standard applies to disputes between two natural parents or between a natural parent and a third party. *Id.* at 175–76, 372 A.2d 582.

---

**5.** Section 5–323 states that the court "shall" appoint separate counsel to represent ... an individual who is the subject of the proceeding. It is a longstanding principle of statutory construction that the word "shall" is mandatory, unless the context in which it is used indicates otherwise. *Bright v. Unsat. C. & J. Fund Bd.,* 275 Md. 165, 169, 338 A.2d 248 (1975).

**6.** The D.'s set forth constitutional arguments in support of the child's right to independent counsel in a proceeding involving the involuntary termination of parental rights. Because we hold that § 5–323 expressly requires that separate counsel for the child be appointed, we need not address the constitutional issue.

We have recognized that in a custody dispute between a natural parent and a third party there exists a general presumption that the child's interests are best served by granting custody to the natural parent. In *Ross v. Pick,* 199 Md. 341, 86 A.2d 463 (1952), we said:

> "Where parents claim the custody of a child, there is a prima facie presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary."

*Id.* at 351, 86 A.2d 463. *See also Sider v. Sider,* 334 Md. 512, 639 A.2d 1076 [September Term, 1993; decided April 18, 1994]. The justification for this presumption is the belief that the parent's natural affection for the child creates a greater desire and effort to properly care for and rear the child than would exist in an individual not so related. *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387 (1959). Similarly, in adoption cases, we have recognized that the right of the parent to rear the child is one which may not be taken away unless clearly justified. And because adoption carries with it a finality not present in a custody decision, it is even more imperative that the decision be made with due regard to the rights of the natural parent. We have said:

> "Unlike awards of custody ... adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course is clearly justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent."

*Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273 (1960) (citations omitted). *See also Bridges v. Nicely,* 304 Md. 1, 14, 497 A.2d 142 (1985) (the adoption must be "clearly warranted").

■ But we have also made clear that the controlling factor, or guiding principle, in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interests of the child. *See Lippy v. Breidenstein,* 249 Md. 415, 420, 240 A.2d 251 (1968); *Ex Parte Johnson,* 247 Md. 563, 569, 233 A.2d 779 (1967). We have said that in all cases where the interests of a child are in jeopardy the paramount consideration is what will best promote the child's welfare, a consideration that is of "transcendant importance." *See Dietrich v. Anderson,* 185 Md. 103, 116, 120, 43 A.2d 186 (1945).

■ Therefore, where an adoption petition by a third party is opposed by a natural parent, a presumption that it is in the child's best interest to maintain the legal relationship with the natural parent may be rebutted by evidence of unfitness or exceptional circumstances that would render a decision in favor of the parent detrimental to the child. *See Winter, supra,* 217 Md. at 396, 143 A.2d 81.

We have not heretofore explicitly enumerated the factors which would constitute exceptional circumstances in the context of a contested adoption case. Such a determination necessarily depends upon the facts and circumstances of each case. *Shetler, supra,* 231 Md. at 308, 190 A.2d 76. However, it is possible to derive guidance from our prior decisions. In *Ross v. Hoffman, supra,* we set forth a number of factors relevant to the existence of exceptional circumstances in a custody dispute between a natural parent and a third party. We said:

"The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensi-

ty and genuineness of the parent's desire to have the child, [and] the stability and certainty as to the child's future in the custody of the parent."

*Id.* 280 Md. at 191, 372 A.2d 582.

▮▮▮ Our adoption decisions have rested upon similar factors.[7] We have considered the length of time that a child has been with the prospective adoptive parents and the strength of the attachment between the child and the prospective adoptive parents, *see King v. Shandrowski,* 218 Md. 38, 42, 145 A.2d 281, 284 (1958); we have also considered the relative stability of the child's future with the natural parent and with the prospective adoptive parents, *see Atkins v. Gose,* 189 Md. 542, 56 A.2d 697 (1948).

We think other *Ross v. Hoffman* factors may be equally relevant to the consideration of exceptional circumstances in contested adoption cases: the sincerity of the natural parent's desire to rear the child, the age of the child when care was assumed by the third party, and the emotional effect of the adoption upon the child.

Another factor that we have considered relevant to a custody decision which would be equally relevant to an adoption decision is the relative effect upon the child's stability of having one, as opposed to another, or both, of the relationships continue. *See Monroe v. Monroe,* 329. Md. 758, 621 A.2d 898 (1993).

In addition to the factors noted above, we have considered as factors relevant to a child's best interests in adoption cases abandonment by the father, *see Alston v. Thomas,* 161 Md. 617, 620, 158 A. 24 (1932); as well as a failure to support or to

---

7. We have not previously considered the application of the best interest standard in connection with an independent adoption under § 5–312. We have considered the standard's application with regard to a precursor to § 5–312, Maryland Code (1957) Art. 16, § 74. Section 74 provided that a decree of adoption could be granted without a natural parent's consent if the court found that consent was "withheld contrary to the best interests of the child."

visit the child, *see Walker, supra,* 221 Md. at 283, 157 A.2d 273.[8]

The last three factors reflect the importance of examining the natural parent's behavior with regard to the child. Such behavior provides insight into the parent's character, motivation, or ability to fulfill parental responsibilities. While a parent's behavior and character are obviously relevant to a fitness determination, they are just as relevant to a finding of exceptional circumstances that would make a decision in favor of the parent detrimental to the child. Behavior that may not be extreme enough to warrant a finding of unfitness is still relevant to the ultimate finding of whether it is in the child's best interest to grant an adoption over the objection of the parent. Therefore, in making the best interest determination, this evidence can, and should, be considered not only with regard to fitness, but as a potential factor which may give rise to exceptional circumstances warranting the termination of parental rights.

In this regard, we note that courts have considered the natural father's abandonment of the child *before* the child's birth as evidence of abandonment, *see, e.g., Matter of Adoption of Doe,* 543 So.2d 741 (Fla.), *cert. denied,* 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989); *Matter of Adoption of Baby Boy S.,* 16 Kan.App.2d 311, 822 P.2d 76 (1991); *Doe v. Attorney W.,* 410 So.2d 1312 (Miss.1982); *Matter of Adoption of Baby Boy W.,* 831 P.2d 643 (Okl.1992), and we think it appropriate to consider this behavior as a factor relevant to the existence of exceptional circumstances. A man who deserts the expectant mother, aware that there is a substantial possibility that he is the father of her child, leaving her dependent upon others, with no regard for her prenatal care

---

8. A failure to support and a failure to maintain contact with the child have been set forth in § 5–312, along with abuse of the child, as alternative factors, one of which is necessary to grant an adoption petition without consent of the natural parent. Although these factors must be satisfied apart from their relevance to a best interest determination, they are still appropriately considered in the best interest analysis.

or concern as to whether the mother will have an abortion or carry the child to term, thereby shows a distinct lack of regard for the future well-being of both the mother and child.

■ Similarly, behavior of the natural parent tending to show instability with regard to employment, personal relationships, living arrangements, and compliance with the law is also relevant to the existence of exceptional circumstances. These factors clearly relate to the parent's ability to provide a stable environment for the child, which is universally recognized as critical to a child's proper development. The mere presence of any of these factors may not warrant a finding of exceptional circumstances justifying the termination of parental rights; these are simply factors to be considered in the best interest analysis.

## C

### The Failure to Contribute

■ Section 5-312(b)(4) sets forth three alternative factors, at least one of which must exist before a petition for adoption may be granted. The only factor relevant here is § 5-312(b)(4)(ii)—that the natural parent "has repeatedly failed to contribute to the physical care and support *of the child* although financially able to do so." (Emphasis added). Ernest asserts that the Court of Special Appeals erred in overturning the trial court's factual finding that it had not been proven by clear and convincing evidence that Ernest failed repeatedly to contribute to Baby G.'s care and support. The standard applicable to the intermediate appellate court's review in this regard is whether the trial court's findings of fact were clearly erroneous. *See* Maryland Rule 8-131; *Ross v. Hoffman, supra,* 280 Md. at 185, 372 A.2d 582.

The trial court based its findings on the existence of two checks, one made out to "cash," the other to Ernest, and on Ernest's testimony that he gave the checks to his attorney to offer them to the D.'s. The court concluded on that basis that Ernest had offered the money to the D.'s. It also determined that because the D.'s did not request or expect a contribution

from Ernest, Ernest's efforts were sufficient to preclude a finding that he had failed to contribute to Baby G.'s support.

Ernest does not contend that the D.'s actually received the checks which he produced at trial. Assuming that Ernest's mere offer of the checks to the D.'s would have fulfilled his responsibility to contribute to Baby G.'s support, the evidence must be sufficient to support the court's finding that Ernest actually offered the checks to the D.'s and that the checks were refused by the D.'s. Ernest asserts only that he gave the checks to his attorney and that he believes that the checks were offered to, and refused by, the D.'s. Moreover, it appears from the record that the check amount reflected the cost of Mellisa's medical bills, rather than the cost of Baby G.'s physical care and support; in our view, these are two different things and we think § 5–312(b)(4)(ii) is principally directed to the latter. Based upon the record, it appears that Ernest made no payments, nor offers, of support from his own funds for Baby G.'s physical care and support. Thus, the Court of Special Appeals did not err in holding that the trial court was clearly erroneous in concluding that it could not find by clear and convincing evidence that Ernest had repeatedly failed to contribute to Baby G.'s physical care and support.

### D

### *The Timing Requirements*

Section 5–312(b) provides, in relevant part, that "[w]ithout the consent of the child's natural parent, a court may grant a decree of adoption to [an individual] who has exercised physical care, custody or control of a child for at least 6 months, if ... [*inter alia*] the child has been out of the custody of the natural parent for at least 1 year." Ernest argues that the Court of Special Appeals erred in concluding that the "6 months" and "1 year" provisions refer not to the filing, but to the granting of the petition.

As we stated earlier, in discerning legislative intent with regard to these provisions, we look first to the plain

language of the statute. *Condon, supra,* 332 Md. at 491, 632 A.2d 753. The statute states plainly that "a court may grant a decree of adoption" upon the passage of the relevant time periods. It does not refer explicitly to the timing of the filing of the petition. Ernest asks that we construe the statute to impose this time requirement upon the filing, as well. However, where the language of a statute is clear and unambiguous, we will not add words to reflect an intent not evidenced by that language. *State v. In re Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988). Moreover, Ernest apparently finds no support for his interpretation in the legislative files.[9] He relies instead upon the principle that a cause of action must be ripe at the commencement of a suit; he thus contends that the petition was filed prematurely because the D.'s cause of action did not then exist. We disagree. The continued custody of the prospective adoptive parents and lack of custody of the natural parent for the specified period of time before a court may grant the adoption are not required to exist at the filing of the petition for adoption if the petition otherwise complies with statutory requirements.

As to Ernest's assertion that this interpretation of the statute denies him due process, we observe that throughout the period in question, Ernest was afforded the opportunity to assert his parental rights with regard to Baby G. He does not contend, nor could he, that he was not afforded an opportunity

---

9. Indeed, an examination of the legislative file for S.B. 336, the source of § 5–312's precursor, Art. 16 § 77, would lead to a contrary conclusion. During the development of this legislation, the language of § 77(b) actually read: "A petition for adoption may be filed...." This language was amended to its current form before the bill was passed, clearly reflecting an intent by the legislature that the time provisions relate to the granting, rather than the filing. Moreover, the time requirements of § 77 and the original version of § 5–312 were 1 and 3 years, rather than 6 months and 1 year; § 5–312 was subsequently amended to shorten these time requirements. As the Senate Judiciary Committee report for S.B. 646 reveals, the legislative intent behind the amendment was to *expedite* independent adoptions. Thus, we find no support for the position that the legislature intended to impose the statutory time limits upon the filing of the petition, a requirement which would, in many cases, substantially delay the granting of an adoption petition.

to be heard with regard to custody and other issues affecting Baby G.'s future.

## IV

We have thus determined that § 5–323 of the Family Law Article is applicable to contested adoption cases, and that in the circumstances of this case separate independent counsel should have been appointed to represent Baby G.'s interests at the trial.

We have also concluded that under § 5–312(b), applicable to independent adoptions, it must be shown by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights; and that, under this standard, any "exceptional circumstances" must also be taken into account in adjudicating the merits of the adoption petition. We agree with the Court of Special Appeals that it is unclear from the record in this case whether the trial court correctly applied the best interest analysis with regard to the existence of any exceptional circumstances which would render a decision in favor of the natural father detrimental to the child. It is manifest that all relevant evidence must be considered in light of the governing factors and principles herein articulated, not only with regard to Ernest's fitness but also to the existence of any exceptional circumstances.

Moreover, we are in agreement with the Court of Special Appeals that, based upon the record in this case, the trial court was clearly erroneous in concluding that it could not find by clear and convincing evidence that Ernest had repeatedly failed to contribute to Baby G.'s physical care and support.

And we also have concluded that the Court of Special Appeals correctly decided that the petition for adoption in this case was timely filed.

In view of our holding, we shall invoke the provisions of Maryland Rule 8–604(d), which provides:

> "If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting

further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate 'court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. . Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court."

Consistent with the purpose of this rule, we shall order a limited remand of the case to the trial court, first, to appoint independent counsel to represent Baby G.'s best interest and, second, to conduct further proceedings, with independent counsel's full participation in the conduct of such proceedings, in order to determine the merits of the adoption petition in accordance with the principles and precepts set forth in this opinion.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH-OUT AFFIRMANCE OR REVERSAL WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEED-INGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.*