701 A.2d 110

**In re ADOPTION/GUARDIANSHIP NO. 3598 in the Circuit Court, for Harford County, Maryland.**

**No. 40, Sept. Term, 1996.**

Court of Appeals of Maryland.

Oct. 10, 1997.

296

Leslie Scherr (Elisabeth J. Lyons, Seymour & Scherr, Washington, DC; Dawn Oxley Musgrave, Baltimore, all on brief), for Petitioner.

Alfred N. Kramer, Aberdeen, for Respondent.

Before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* BELL and RAKER, JJ.

---

* Murphy, C.J. and Karwacki, J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

BELL, Judge.

The instant case concerns the adoption of a female minor child born in Poughkeepsie, Dutchess County, New York. Over the objection of the biological father, pursuant to a private adoption agreement between the biological mother and prospective adoptive parents, the child was taken to Harford County, Maryland, where the adoptive parents, the petitioners, sought and were granted a decree of adoption. A divided panel of the Court of Special Appeals reversed the judgment of the Circuit Court for Harford County, finding that the trial court should not have granted the adoption, because of the petitioners' violation of the Interstate Compact on the Placement of Children (ICPC). *In Re Adoption/Guardianship No. 3598,* 109 Md.App. 475, 503, 675 A.2d 170, 184, *cert. granted,* 342 Md. 582, 678 A.2d 1047(1996). We shall hold that the best interest of the child standard continues to be the uncompromising standard in all adoption proceedings and, in relying on that standard, the trial court did not abuse its discretion in granting the adoption petition at issue. Accordingly, we shall reverse the Court of Special Appeals and affirm the judgment of the circuit court. We observe, however, that certain facts and circumstances may provide an adequate basis for the dismissal of an adoption petition as a penalty for violating the ICPC.

## I.

In early 1991, Jerry C., the respondent and the natural father of Baby Girl S., and Amy S., her natural mother, both residents of State of New York, met at "Let's Dance," a night club located in Dutchess County, New York, and developed a casual friendship. The respondent and his brother were popular night club dancers; the natural mother frequented the area night clubs to dance and socialize with friends. As avid night club patrons, the respondent and the natural mother would meet at different clubs approximately twice a week. Over a short period of time, their casual relationship became intimate and, as a result, the natural mother, an eighteen year old high school senior, spent one night with the respondent

and became pregnant. The respondent, known to the natural mother only by the nickname "Manny," was twenty-one years old at the time.

A few days following the sexual encounter, the natural mother's father moved to Vermont, thus prompting the natural mother to move to the other side of the Hudson River to live with her mother and stepfather in a mobile home. The respondent had no knowledge of either the natural mother's relocation or her pregnancy until he saw her at a night club several months later.[1] Upon learning of the pregnancy, the respondent did not deny paternity; rather, he expressed a willingness to support the child. According to his testimony, the respondent said, "If you say I am the father, I am the father. I will live up to my responsibilities." The respondent's assistance, as it turns out, materialized only in the form of casual services, not financial assistance. Although the natural mother was a high school student and the respondent was employed, the respondent never offered to pay any of the natural mother's medical expenses.[2] The only overt acts by the respondent evidencing his willingness to assist the natural mother during her pregnancy consisted of driving the natural mother, on two occasions, from school to Vassar Brothers Hospital for prenatal care. On the first occasion, the respondent waited outside and then drove the natural mother home. On the second occasion, when they left the hospital, the respondent took the natural mother to his home, where she met his mother and other family members. Because the

---

1. At trial, the respondent testified that the natural mother was five months pregnant at the time he learned of the pregnancy. Natural mother, however, testified that she was, in fact, three months pregnant.

2. The respondent testified that he took natural mother to the Department of Social Services to obtain public assistance for her medical expenses. Natural mother denies this. In any event, it is undisputed that at the time natural mother applied for public assistance she still did not know respondent's full name, and respondent did volunteer such information. Consequently, at the Department of Social Services, natural mother was able to provide only respondent's first name. The Department had to call respondent's place of employment to obtain his full name.

natural mother was experiencing difficulties in connection with the pregnancy at her mother's home, the respondent's mother invited the natural mother to move in with the respondent's family, an invitation that, for reasons not in the record, the natural mother declined. On that occasion, after introducing the natural mother to his family, the respondent went out for the remainder of the evening without informing the natural mother of his whereabouts. In fact, when he had not returned by the next morning, and the natural mother had not received a phone call from him, the natural mother walked back to Vassar Brothers Hospital, where she called her relatives to come take her home.

Aside from the hospital visits, the respondent and the natural mother had minimal contact, especially during the last few months of the pregnancy. The respondent testified that the natural mother was responsible for the lack of contact, as he tried calling and visiting the natural mother, but the natural mother's mother and stepfather told him to stay away. On one occasion, the respondent and his mother visited the natural mother's mobile home, but were told by her stepfather to leave and that the natural mother did not want to see the respondent. The natural mother confirmed this incident, testifying that she was at home on that occasion, but that she did not want to see the respondent.

During the last couple of months of the pregnancy, the natural mother received home-teaching and began meeting with a school-sponsored social worker. The latter advised her to consider adoption as an option for the child after birth. Coincidentally, the social worker learned through a mutual friend that the petitioners, Paul and Deborah M.[3], were inter-

---

**3.** Mr. and Mrs. M. were married in 1986. Being unable to have children of their own, they became interested in adopting a child. The M's are licensed foster care parents, who have had nine foster children placed with them, for periods ranging from one night to eight months. Mrs. M., who was 39 years old at the time of trial, is a computer programming analyst, earning an annual salary of $43,000. Mr. M., who was 42 years old at the time of trial, is a computer network administrator, earning approximately $50,000 per year.

ested in adopting a child. The natural mother testified that, faced with a Hobson choice, she concluded that, rather than rearing a child without financial support from the respondent, adoption was the optimal course of action for her. Therefore, she telephoned the petitioners and they began negotiating the terms of the adoption.[4] Throughout the negotiations, which included several telephone conversations and a personal meeting, the natural mother told the petitioners that the father of the child was "out of the picture" and was not interested. She also told them that she did not know his name.

In late April 1992, after the petitioners and the natural mother had agreed on the terms of the adoption, the petitioners engaged counsel in New York to represent the natural mother and to prepare and file the necessary documents to comply with the ICPC. On the application submitted to the New York State ICPC Administrator, the natural mother indicated that the father of the child was "unknown." Prior to trial, it was stipulated by all parties that the natural mother knew at all relevant times the identity and whereabouts of the respondent, the natural father.

On May 3, 1992, the natural mother gave birth to a female child, Baby Girl S., in Poughkeepsie, New York. Two days later, the respondent, accompanied by his mother and other family members, came to the hospital to see Baby Girl S. carrying balloons, flowers, and gifts. As soon as they reached the natural mother's floor, however, and, thus, before they were able to see new born Baby Girl S., at the behest of the natural mother's mother and one of the petitioners' relatives, pursuant to a complaint from the natural mother, hospital security escorted the respondent and his relatives out of the

---

4. This arrangement is termed an "independent adoption." As this Court has recognized, "[i]n independent adoptions the natural parents and prospective adoptive parents negotiate either directly or through attorneys. Since no agency is involved the natural parents have greater control over the selection of the adoptive parents and often release the child into the temporary custody of the adoptive parents pending the final act of the court granting adoption." *In Re Adoption No. 10087,* 324 Md. 394, 400 n. 1, 597 A.2d 456, 459 n. 1 (1991) (*quoting In Re Lynn M.,* 312 Md. 461, 464 n. 1, 540 A.2d 799, 800 n. 1 (1988)).

hospital. As the respondent and his family were being escorted out of the hospital under protest, Mrs. M., who had been in New York since the natural mother went into labor and who had spent time with Baby Girl S. the previous day, was waiting in the hospital lobby to take possession of Baby Girl S. Upon receiving custody of Baby Girl S. from the natural mother's attorney, Mrs. M. went to her father's house in New Paltz, New York to await permission from the ICPC Administrator to transport Baby Girl S. to Maryland.

Later that day, the natural mother, through counsel, filed an Affidavit Relating to the Biological–Father's Consent and an Extrajudicial Consent Form 2–G with the Surrogate's Court of Ulster County, New York. Those forms were necessary in order for the natural mother to obtain approval to place Baby Girl S. with the petitioners. The natural mother's affidavit, signed over her attorney's signature and notary seal, states, in pertinent part:

2. The biological father of the child is unknown to [the natural mother] and no person has taken steps to establish legal responsibility for the child.

3. The biological father, if known, has not made payment of pregnancy nor birth expenses.

4. The biological father, if known, has not publicly acknowledged paternity.

5. The biological father, if unknown, has taken no other steps to evince a commitment to the child.

Likewise, in the Extrajudicial Consent Form, the natural mother stated that the respondent's full name and address were "unknown." That statement, like its counterpart in the affidavit, was false. Moreover, the respondent was never notified of the proceedings in the Surrogate's Court. Thus, it is clear, and the petitioners do not dispute, that the natural mother's purpose in making these false statements was to obtain certification from the Surrogate's Court in order to effectuate the placement of the child and ultimately to facilitate the adoption.

Two days after the incident at the hospital, on May 7, 1992, the respondent filed a petition in the Family Court of Dutchess County, New York, for a Filiation Order, declaring him to be the father of Baby Girl S. In response to this petition, by letter dated May 15, 1992, addressed to the court, the natural mother's attorney informed the court that the natural mother admitted that the respondent was Baby Girl S.'s natural father. The letter states as follows:

I represent [the natural mother] of Gardiner, New York, who received a copy of a Summons and Petition of the above-captioned petitioner to be declared the father of a child born out of wedlock to my client on May 3, 1992. The matter is returnable before you for an initial appearance on June 15, 1992.

My client does not deny the allegations of the Petition (although she was unaware of the true name of petitioner) and would consent to the entry of a decree of paternity at this time. There are two reasons for this request.

My client entered into an agreement, before the birth of the child, to place the child for adoption with an out-of-state couple. As of this writing, the requirements for the Interstate Compact approval are near completion and we expect the child to be released to the adoptive parents. When have simultaneously scheduled an appearance by the birth mother at the Ulster County Surrogate's Court to formalize her surrender. In light of the recent Court of Appeals decision [sic] in *Matter of Raquel Marie X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, it appears likely that the putative father would be entitled to notice of the Surrogate's Court proceeding and an order in the Dutchess County Family Court at this time acknowledging paternity would enable us to proceed in the Ulster County Surrogate's Court without further delay, now that my client is aware of the name and address of the putative father.

This letter had no effect on the paternity case. Notwith-

standing the letter,[5] the respondent was not declared to be the father of Baby Girl S. until June 7, 1993. Indeed, during the paternity proceedings, the natural mother contested the respondent's paternity, necessitating that she, the respondent and Baby Girl S. undergo blood analysis. This caused a significant delay: blood could not be drawn from Baby Girl S. until she was at least six (6) months old, and thereafter, the petitioners canceled two scheduled blood examinations.

Between May 16, 1992 or May 18, 1992, about two weeks after the birth of Baby Girl S., the petitioners transported Baby Girl S. from New York to Maryland. The petitioners testified that they did so only after their attorney in Maryland told them that she had received verbal approval from the ICPC Administrator.[6] As it turns out, neither New York nor Maryland ever approved the application. A handwritten letter dated May 27, 1992, from Maryland's ICPC Administrator to New York's ICPC Administrator, with a copy to the petitioners' attorney, confirms that no approval was never granted:

> Somehow a mixup occurred and this couple came to MD with the baby prior to approval. Referral is incomplete. I received only 100 A's from your office. Please send special medical history of birth parents, home study of adoptive parents, delivery and discharge hospital information, and statement from the N.Y. attorney as to how the birth father's rights will be addressed.

To date, neither the Maryland nor the New York ICPC administrator has approved the placement of Baby Girl S. with the petitioners in Maryland.

---

**5.** Despite the acknowledgment that the respondent was entitled to notice of the Surrogate's Court proceedings, the respondent never received notice of those proceedings. Nor was the previously-filed affidavit and Extrajudicial Consent Form 2–G ever amended to reflect the natural mother's admission that the respondent was the natural father of Baby Girl S.

**6.** It was revealed at trial that what happened was that the New York ICPC Administrator left a message with the petitioners' attorney's office, stating that approval had been granted. The petitioners' attorney understood the message to mean that both New York and Maryland had approved the placement.

On May 22, 1992, a few days after the petitioners arrived in Maryland with Baby Girl S., the petitioners filed a Complaint for Adoption and Change of Name in the Circuit Court for Harford County.[7] The Complaint named the respondent as the natural father of Baby Girl S and acknowledged that he had not consented to the adoption. Accompanying the Complaint were the natural mother's signed consent to the adoption, and a Show Cause Order and Notice of Objection to be served upon the respondent. On June 18, 1992, the circuit court granted temporary custody of Baby Girl S. to the petitioners. On the same day, the Show Cause Order was issued, notifying the respondent that he had the right to object to the adoption. Service of the show cause order was first attempted in early July by restricted certified mail. The show cause order was returned marked "unclaimed." In August 1992, service of the show cause order by private process server was again attempted. Unable to serve the respondent, the process server swore in his affidavit that, "Numerous attempts were made at the [respondent's] home address. Never able to find him home. According to neighbors, he works very late in evening and leaves early morning. Tried setting up appointment but he never returned call." A third show cause order was issued, but not served, in November 1992. The respondent was finally served in April 1993, by the natural mother's attorney, at a paternity hearing in New York.

Although not served until April 1993, the respondent had knowledge of the pending adoption action in Harford County. At trial, the respondent testified that he learned about the adoption proceedings in August 1992 when, at a paternity hearing, the natural mother told him. She explained that she no longer had Baby Girl S. Also, in late November 1992, the

---

7. The Court of Special Appeals points to the fact that, while Mr. M. testified that Baby Girl S. was brought to Maryland on or before May 18, 1992, the Complaint for Adoption and Change of Name, which is date-stamped May 22, 1992, states that the petitioners "are awaiting final approval from the Maryland Interstate Compact Administrator before bringing [Baby Girl S.] to Maryland." The intermediate court, not the trial court, found that this evidences foul play.

petitioners contacted and met the respondent, his mother, and his aunt at a diner in New Paltz, New York. At that meeting, which both parties described as amicable, the petitioners showed the respondent pictures of Baby Girl S., whom, he testified, he knew beyond doubt, was his biological child, as soon as he saw the pictures. That meeting did not resolve the differences between the petitioners and the respondent, however; both sides maintained their desire to have Baby Girl S.

The blood analysis indicated that the probability of the respondent's paternity was 98.19% and, accordingly, on June 7, 1993, the Dutchess County court entered an Order of Filiation declaring the respondent to be the natural father of Baby Girl S. Shortly thereafter, on June 11, 1993, the respondent filed his notice of objection to the adoption, accompanied by with a copy of the filiation order, in the Circuit Court for Harford County.

On July 26, 1993, the circuit court appointed counsel to represent the interest of Baby Girl S., conduct an investigation of the case, and make a recommendation to the court. The court also appointed a social worker to conduct an investigation as required by Maryland Code (1991 Repl.Vol., 1997 Supp.) § 5–312(c) of the Family Law Article.[8] Both, the attorney and the social worker, submitted reports concluding that the best interest of Baby Girl S would be served by allowing the petitioners to adopt the child.[9]

---

**8.** Section 5–312(c) provides:

In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child under this section, the court shall request:

(1) an investigation by an appropriate agency; and
(2) a report of the investigation that includes summaries of:
(i) the child's feelings toward and emotional ties with the child's natural parents, the child's sibling, the petitioners, and any other individual who may significantly affect the child's best interest;
(ii) the child's adjustment to home, school, and community; and
(iii) if the natural parent is absent, an evaluation of the petitioner's attempts to locate the absent natural parent.

**9.** The social worker attempted to interview the respondent, but the respondent failed to make himself available. Baby Girl S.'s attorney,

On December 14, 1993, the respondent filed a motion to dismiss the adoption petition citing, as justification, violations of the ICPC by the petitioners. The circuit court denied the motion. On September 16, 1993, Jerry C. filed a motion for visitation, which the court held in abeyance. Trial on the adoption petition commenced on March 7, 1994.[10] On November 9, 1994, the trial court issued a memorandum opinion granting the petitioners' petition for adoption. The trial judge found, *inter alia*, that the respondent made no sincere effort to fulfill his role as the natural father of Baby Girl S, having failed to contribute to the prenatal and postnatal care of Baby Girl S. The judge also found that adoption was in the best interest of Baby Girl S. because, over a period of two (2) years, she had emotionally bonded to the petitioners and a separation at that point would have been traumatic. On March 24, 1995, therefore, the court entered a final decree of adoption.

---

however, had an opportunity to interview the respondent, and, in a letter to the trial court, made the following observation:

[A]lthough I believe all concerned are sincere in their wishes to keep the child. I believe the [adoptive parents] were much more realistic and candid in their conversations with me. When I speak with [them], what they tell me is honest and consistent with my observations. Jerry[, the respondent and his mother], on the other hand, seem to put the best "spin" on everything they say to me, apparently saying what they think I want to hear. There is frequently a sense of dissonance between their words and my perceptions. When I asked specific questions about statements they made, they frequently began to backpedal.

10. On March 14, 1994, after two days of testimony, the Honorable James D. Pagones of the Family Court in Dutchess County, New York, ruled that New York courts had exclusive jurisdiction over all matters concerning custody, visitation, and adoption of Baby Girl S. He therefore granted the respondent temporary physical custody of Baby Girl S. In addition, Judge Pagones issued a writ of habeas corpus, ordering the petitioners to transfer custody of Baby Girl S. to the respondent. Three days later, Judge Pagones conferred, by telephone, with Judge Cypert O. Whitfill, who was presiding over the Maryland adoption case. That conference resulted in their agreeing that the New York proceedings would be stayed and the Maryland court should exercise jurisdiction and complete the adoption proceedings.

A divided panel of the Court of Special Appeals reversed the trial court's judgment and ordered dismissal of the adoption decree. The majority held that the petitioners, or their attorney, "knowingly violated the ICPC," and that those violations mandated dismissal of the adoption petition. The court also held that the trial court granted the adoption in violation of § 5–312(d)(2) of the Family Law Article. That section prohibits the granting of an adoption when the sole basis is because one birth parent has deprived the other birth parent of custody. The dissenting judge countered by contending that the trial court "is vested with the discretion to balance the nature and gravity of the [ICPC] violation with the best interest of the child and that, based on this case, there is sufficient evidence to support the trial judge's findings."

## II.

The standard of review in adoption cases, like custody cases, is whether the trial court, in making its determination, abused its discretion or made findings of fact that were clearly erroneous. *Petrini v. Petrini*, 336 Md. 453, 470, 648 A.2d 1016, 1023, (1994); *In Re Adoption No. 11137*, 106 Md.App. 308, 314, 664 A.2d 443, 446 (1995); *Coffey v. Dep't of Social Servs.*, 41 Md.App. 340, 345, 397 A.2d 233, 237 (1979). We said in *Petrini*:

> The standard of review in custody cases is whether the trial court abused its discretion in making its custody determination. *Davis v. Davis*, 280 Md. 119, 125, 372 A.2d 231 (1977), *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh. denied*, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978). In setting forth this standard, we concluded that "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Davis, supra*, 280 Md. at 126, 372 A.2d 231. See also *Robinson v. Robinson*, 328 Md. 507, 513–14, 615 A.2d 1190 (1992); *Domingues v.*

*Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133 (1991); *Ross, supra,* 280 Md. at 186, 372 A.2d 582.

*Petrini,* 336 Md. at 470, 648 A.2d at 1023.

 Judicial discretion was defined in *Saltzgaver v. Saltzgaver,* 182 Md. 624, 635, 35 A.2d 810, 815 (1944) (quoting Bowers' Judicial Discretion of Trial Courts at ¶ 10) as "that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing statute or rule." It has also been defined as a "reasoned decision based on the weighing of various alternatives." *Judge v. R and T Construction Co.,* 68 Md.App. 57, 60, 509 A.2d 1236, 1237 (1986), *cert. denied,* 307 Md. 433, 514 A.2d 1211 (1986). There is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court," *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025, 1031, (1994)(quoting *In Re Marriage of Morse,* 240 Ill.App.3d 296, 180 Ill.Dec. 563, 571, 607 N.E.2d 632, 640 (1993)) or when the court acts "without reference to any guiding rules or principles." *North,* 102 Md.App. at 13, 648 A.2d 1025 (quoting *Long John Silver's, Inc. v. Martinez,* 850 S.W.2d 773, 775 (Tex.App.1993)). An abuse of discretion may also be found where the ruling under consideration is "clearly against the logic and effect of facts and inferences before the court," *Id.* (quoting *Shockley v. Williamson,* 594 N.E.2d 814, 815 (Ind.App.1992)), or when the ruling is "violative of fact and logic," *Id.* (quoting *Young v. Jangula,* 176 Mich.App. 478, 440 N.W.2d 642, 643 (1989)).

 Questions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *Northwestern National Insurance Co. v. Samuel R. Rosoff, Ltd.,* 195 Md. 421, 436, 73 A.2d 461, 467 (1950). *See Hamilton v. Hamilton,* 242 Md. 240, 243, 218 A.2d 684, 686, *cert. denied,* 385 U.S. 924, 87 S.Ct. 239, 17 L.Ed.2d 147 (1966); *Ryan v. Johnson,* 220 Md. 70, 150 A.2d 906 (1959); and *Clarke Baridon, Inc. v.*

*Union Asbestos and Rubber Co.,* 218 Md. 480, 483, 147 A.2d 221, 223 (1958); *Cromwell v. Ripley,* 11 Md.App. 173, 177, 273 A.2d 218, 221 (1971), *citing Abrams v. Gay Investment Co.,* 253 Md. 121, 251 A.2d 876 (1969). In sum, to be reversed

> [t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*North,* 102 Md.App. at 14, 648 A.2d at 1032.

## III.

The petitioners argue that the Court of Special Appeals exceeded its scope of review, with respect to the ICPC, in finding that they or their attorney "knowingly violated the ICPC," and consequently, the respondent's legal rights were impaired. The intermediate appellate court held:

> We believe that, under the facts and circumstances of this case, the trial court abused its discretion in denying [the respondent's] motion to dismiss on grounds of a violation of the ICPC. [The petitioners] or their attorney knowingly violated the ICPC by bringing Baby Girl S. into Maryland before Compact approval. There was absolutely no evidence below that either the New York State Compact Administrator or the Maryland Compact Administrator ever gave [the petitioners] permission to remove Baby Girl S. from New York.

> \* \* \* \*

> The illegal removal of Baby Girl S. from New York greatly impaired the rights of the [respondent] to have custody of Baby Girl S. [The respondent's] paternity action was substantially delayed, and the removal deprived [respondent] of the ability to develop emotional ties with Baby Girl S. and thus ultimately made it more difficult, under Maryland law, to object to the adoption. We conclude that the violation was not a mere technicality; it prevented the Maryland Compact Administrator and the New York State

Compact Administrator from making a proper determination; it prevented both administrators from conducting further investigations that might have revealed [respondent's] objections; it deprived the State of New York of jurisdiction over a child born within its boundaries; and it ultimately led to a situation whereby sufficient time elapsed that the child's welfare seemingly dictated adoption.

*In Re Adoption/Guardianship No. 3598*, 109. Md.App. at 503–04, 675 A.2d at 184. Therefore, the Court of Special Appeals opined, the trial judge should have revoked the petitioners' "legal authorization" to bring Baby Girl S. into Maryland, thereby dismissing the petition for adoption. Such an enforcement of the ICPC, it posits, would deter future violations and forum-shopping, and prevent Maryland from becoming "a safe haven for those who illegally remove babies from foreign states." *Id.* at 506, 675 A.2d at 185.

■■■■ The ICPC has been enacted in 49 states, including Maryland, Maryland Code (1984, 1991 Repl.Vol. & 1996 Supp.) §§ 5–601 to 5–611 of the Family Law Article, with the intended purpose of facilitating interstate adoption and increasing the number of acceptable homes for children in need of placement. *In re Adoption No. 10087*, 324 Md. 394, 404, 597 A.2d 456, 461 (1991) (*citing* Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 Neb. L.Rev. 292, 293 (1989)). The primary purpose of the ICPC in Maryland is to assure that the child being placed receives "the maximum opportunity to be placed in a suitable environment ... with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." Family Law Art. at § 5–602(1).[11] To accomplish its purpose,

---

11. Section 5–602 articulates the purpose and policy of the ICPC:

It is the purpose and policy of the party state to cooperate with each other in the interstate placement of children to the end that: (1) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

the ICPC "extend[s] the jurisdictional reach of a party state into the borders of another party state for the purpose of investigating a proposed placement and supervising a placement once it has been made." *In Re Adoption No. 10087*, 324 Md. at 404, 597 A.2d at 461(*quoting* Hartfield at 296). The ICPC requires that,

No sending agency [12] shall send, bring, or cause to be sent or brought into any other party state any child ... as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein.

Family Law Art. § 5–604(a). The ICPC further requires:

The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

§ 5–604(d). Compliance with the procedures set forth in the ICPC are mandatory. *Bernhardt v. Lutheran Social Services*, 39 Md.App. 334, 344, 385 A.2d 1197 (1978).

In the case sub judice, the petitioners engaged attorneys in New York and Maryland to obtain ICPC approval. The ICPC

---

(2) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with the applicable requirements for the protection of the child.

(3) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

(4) Appropriate jurisdictional arrangement for the care of children will be promoted.(§ 5–602(4)).

12. Section 5–603(2) defines "sending agency" as follows:

a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings or causes to be sent or brought any child to another party state.

In the independent adoption context, this Court has construed "sending agency" to include both the natural and adoptive parents.

application and accompanying documents were filed with the New York compact office and were later transmitted to the Maryland compact office. The petitioners testified that they were advised by their attorney in Maryland that the compact administrator had approved the placement of Baby Girl S. in Harford County. Based solely on that communication, the petitioners testified, they brought Baby Girl S. into Maryland, and soon thereafter filed a petition for adoption in circuit court.

■ The trial court found that the petitioners acted in "good faith" in bringing Baby Girl S. to Maryland only after they were orally advised to do so. It also found that the petitioners' attorney did receive a call from a compact administrator stating that the ICPC application had been approved, noting, in support, the evidence of the completed application that the New York compact office transmitted to the Maryland compact office. That application included a notation asking a Maryland administrator to call with verbal approval. These findings are supported in the record, and therefore are not clearly erroneous. Thus, the trial court did not abuse its discretion. In fact, based on the evidence, the trial judge exercised sound judgment. It bears repeating that the best interest of the child is paramount. That interest may well be found to have been met along with the purpose and goals of the ICPC to have been achieved when, as here, the adoptive parents are previously-approved foster parents and whose home has been determined to be suitable by a prior home study, and subsequently by a court-appointed social worker and attorney.

■ The trial court also found that the respondent's legal rights had been protected. To reach that conclusion, the trial court considered and weighed the natural mother's conduct vis-a-vis the respondent's conduct, and in the final analysis, concluded that the respondent's substantial rights were not impaired and that Baby Girl S. should not suffer as a result of the natural mother's actions. The trial court acknowledged that the natural mother was not totally truthful when she

denied knowledge of the respondent's whereabouts, but it was not convinced that she was "perpetrating an injustice upon him." Rather, the court's view was that the respondent "simply did not move quickly enough to plan for and provide a home for an infant child." The Court of Special Appeals held that these findings were a clear abuse of discretion. In so holding, the intermediate appellate court determined the respondent's rights were impaired by "numerous violations of the ICPC," to wit, the natural mother's purposeful omission of the respondent's identity and whereabouts on the ICPC application, and the affidavit and extra-judicial consent form filed with the Surrogate Court for Ulster County, New York. Another basis for the court's holding that the respondent's rights were violated was the natural mother's failure to serve him with notice of the proceedings in the Surrogate's Court. Thus, the Court of Special Appeals concluded:

> Because [the respondent] was not notified of those proceedings and thus did not appear before it, the Surrogate Court gave the natural mother the certification required by New York law to proceed with the adoption. If [the respondent] had been identified as the father of the child and his objection revealed, New York State Compact Administrator and the New York Surrogate Court in Ulster County would certainly not have permitted appellees to remove Baby Girl S. from New York.

*In re Adoption/Guardianship No. 3598,* 109 Md.App. at 492, 675 A.2d at 178. Contrary to the Court of Special Appeals, we hold that the findings of the trial court are not clearly erroneous.

 With respect to the false statements in the ICPC documents, there is no evidence, nor any reason to believe, that the Maryland ICPC Administrator would have withheld ICPC approval had she been informed of the respondent's objection to the adoption. The procedure set forth in the ICPC does not provide for the rejection of a complete application on the basis that a non-custodial parent is contesting the adoption. Indeed, the ICPC was not designed to protect the rights of birth parents; instead, it is designed to ensure that

placements for children across state lines are safe. As discussed *supra*, that goal was found by the trial court to have been achieved in this case.

Regarding the failure to provide the respondent with notice of the Ulster County Surrogate's Court proceeding, here too, there is no evidence that the respondent would have successfully opposed the natural mother's efforts to proceed with the adoption of Baby Girl S. Under New York law, the respondent's consent would not have been required for this adoption, as, in that State, an unwed father has the right to veto an adoption only if he manifests a willingness to assume full custody of the child within a six-month period immediately preceding the placement of the child for adoption. *Matter of Raquel Marie X,* 76 N.Y.2d 387, 408, 559 N.Y.S.2d 855, 865, 559 N.E.2d 418, 428 (N.Y.), *cert. denied, Robert C. v. Miguel T.,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 528 (1990), *on remand, Matter of Raquel Marie X,* 173 A.D.2d 709, 570 N.Y.S.2d 604 (N.Y.A.D. 2 Dept.1991); *Matter of Robert O. v. Russell K.,* 80 N.Y.2d 254, 262, 590 N.Y.S.2d 37, 40, 604 N.E.2d 99, 102 (1992).

In *Matter of Raquel Marie X,* 173 A.D.2d 709, 570 N.Y.S.2d 604 (N.Y.A.D. 2 Dept.1991), two months after the birth of an infant female child, the biological mother, without the biological father's consent or knowledge, decided to place the child for adoption. A few days before the biological mother's consent was executed, however, the biological father commenced a custody proceeding against the biological mother, and an order of filiation was subsequently entered. At the adoption proceeding, initiated by the prospective adoptive parents, the trial court denied the petition for adoption. After several appeals on related legal issues, the intermediate appellate court, on remand, held that, although there was evidence that the biological father had made minimal financial contributions toward the post-natal care of the child,[13]

---

**13.** The court found that the biological father's financial contribution consisted of taking the biological mother to the gynecologist and paying the sixty dollars fee, and purchasing a chair for the biological mother

[i]n our view, the evidence of legal responsibility, public acknowledgement of paternity, and contribution to pregnancy and birth expenses fails to demonstrate that [the biological father] is 'a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child' (*Matter of Raquel Marie X.,* 76 N.Y.2d 387, 403, 559 N.Y.S.2d 855, 559 N.E.2d 418, *supra* ).

*Id.,* at 713, 570 N.Y.S.2d at 607. Thus, the court concluded that the biological father's "manifestation of parental responsibility in this case 'was neither sufficiently prompt nor sufficiently substantial' to require constitutional protection." *Id.* (*quoting Matter of John E. v. Doe,* 164 A.D.2d 375, 382, 564 N.Y.S.2d 439 [plurality slip op. by Brown J.]).

Based on the aforementioned, this Court finds that under New York law it is not at all certain that the respondent's consent would have been required to effectuate the adoption of Baby Girl S.. *See Matter of Adoption of Emily Ann,* 137 Misc.2d 726, 522 N.Y.S.2d 786 (Fam.Ct.1987)(natural father lacked standing to oppose adoption because he made no contribution to expenses); *see also Matter of the Adoption of Christopher L.,* 113 Misc.2d 904, 450 N.Y.S.2d 269 (1982)(although mother refused to reveal the identity of natural father to state agency, his consent to adoption was not required as he never contributed to maintenance and support of child).

## IV.

Penalties for violations of the ICPC are prescribed in § 5–605 of the Family Law Article. That section provides as follows:

---

for three hundred and ten dollar to ease her discomfort during the pregnancy. Although the biological father had the biological mother to undergo a sonogram, the one hundred and sixty-five dollar fee was paid for with a check supplied by his father, and the purpose of the sonogram was only to provide him with evidence of the pregnancy which he could use in defending pending criminal charges. *Id.* 570 N.Y.S.2d at 606–607.

The sending, bringing, or causing to be sent or brought into any receiving state of a child in violation of the terms of this compact shall constitute a violation of the laws respecting the placement of children of both the state in which the sending agency is located or from which it sends or brings the child and of the receiving state. Such violation may be punished or subjected to penalty in either jurisdiction in accordance with its laws. In addition to liability for any such punishment or penalty, any such violation shall constitute full and sufficient grounds for the suspension or revocation of any license, permit, or other legal authorization held by the sending agency which empowers or allows it to place, or care for children.

Section 5–605 of the ICPC does not provide sanctions, other than suspension or revocation of a State agency's license, that could or should be imposed on adoptive parents who violate the ICPC. As the Court of Special Appeal stated, retroactive compliance in this case would be impractical and inequitable, four years having passed since the violation of the ICPC occurred.[14]

In *In Re Adoption No. 10087*, 324 Md. 394, 597 A.2d 456 (1991), the seminal case in Maryland on the ICPC, we addressed violations of the ICPC and their effect on an adoption petition. In that case, the prospective adoptive parents were residents of Maryland who sought to adopt a child born in the State of Virginia. Before the child was born, the adoptive parents were told by the Virginia compact office that, in order to obtain approval, the birth mother would need to submit a handwritten application which included the names and address of the adoptive parents. The adoptive parents, however, did not want to disclose their address to the birth mother, and so they refused to file a handwritten ICPC application and the Virginia compact office refused to "facilitate" the adoption.

---

14. Since the decision of the Court of Special Appeals, the petitioners have attempted to obtain retroactive approval from the Maryland ICPC. According to the petitioners, however, they attempts have proven unsuccessful because the personnel of the compact office has changed, leaving no one with knowledge of their initial application.

324 Md. at 401, 597 A.2d at 460. The Maryland ICPC office, however, received all of the necessary paperwork to process and approve the placement, but were unable to do so because Virginia was withholding approval. *Id.* After the baby's birth, the adoptive parents, knowing that they did not have ICPC approval, transported the baby from Virginia into Maryland. The following day, the adoptive parents notified the Maryland and Virginia compact offices that the placement had occurred. Immediately thereafter, the adoptive parents filed in Circuit Court for Montgomery County, a petition for adoption. After determining that the ICPC had been violated, the trial court dismissed the action. *Id.* at 402, 597 A.2d at 460.

 This Court reversed, holding that a violation of the ICPC does not mandate dismissal of the adoption petition; rather, " it indicates the need for a prompt determination of the best interest of [the] child." *Id.* at 412, 597 A.2d at 465. We commented that the most appropriate sanction for an ICPC violation was retroactive compliance, where possible. *Id.* at 413, 597 A.2d at 465. We noted, however:

[I]t should not be concluded from this decision that it is permissible to illegally remove a child from another state and hold it in Maryland until a sufficient time elapses so that the child's welfare dictates adoption. The particulars of this case are unique in that neither the natural parents nor the state of Virginia have, so far, sought to exercise their claims over the child. In addition, at the time they brought the child into Maryland, the petitioners had sought to comply with the ICPC and were acting under the misconception that their act was not wrongful and that compact approval would be immediately forthcoming.

*Id.* at 414, 597 A.2d at 465. Based on the "particulars" of the case, we concluded that dismissal of the adoption petition was inappropriate; removing the child from a suitable home with caring parents and delivering the child to a Maryland state agency "would most penalize the only innocent party involved, the child." *Id.* at 410, 597 A.2d at 464. Additionally, the Court observed that neither the child's natural parents, nor

the State of Virginia sought to exercise their claim over the child. Another factor that the Court considered was that the adoptive parents had brought the child into Maryland knowing that they had not yet received, but were expecting, approval from the compact office, as shown by evidence showing that the adoptive parents contacted both the Maryland and Virginia compact offices a day after bringing the child into Maryland. Thus, we concluded that, based upon the facts and circumstance in that case, dismissing the adoption petition was not in the best interest of the child.[15] *Id.* at 412, 597 A.2d at 465.

In *In Re Adoption No. 10087*, we neither accepted nor rejected the analysis set forth in *In Matter of Adoption of T.M.M.*, 186 Mont. 460, 608 P.2d 130, 134 (1980), the only reported opinion in which an independent adoption was dismissed by a court as a sanction adoptive parents violating the ICPC. In *In Re Adoption of T.M.M.*, the natural mother of a seven year old child consented to his adoption. The adoptive parents, without making any attempt to comply with the ICPC, brought the child form Mississippi to Montana. The Supreme Court of Montana held that a placement made in violation of the ICPC was an "illegal" placement of the child for purposes of an adoption. The sanction for this was the revocation of the natural mother's consent or "legal authorization" and the return of the child to the natural mother. 608 P.2d at 134.

---

**15.** Other courts have similarly held that the best interest of the child should be the primary factor in considering whether to impose the penalty of dismissal for an ICPC violation in adoption proceedings. *In Re Baby Girl* ___, 850 S.W.2d 64, 71 (Mo.1993)("at the pinnacle of the court's decision must be the child's best interest, not the interests of the other parties or even public policy"); *In Re Adoption of C.L.W.*, 467 So.2d 1106, 1110 (Fla.Dist.Ct.App.1985)("the compact is not available to nullify the adoption proceedings") *In Re Adoption of Baby Boy M.G.*, 135 Misc.2d 252, 515 N.Y.S.2d 198, 200–01 (1987)(adoption warranted despite failure to obtain ICPC approval); *In Re Adoption of Baby E.*, 104 Misc.2d 185, 427 N.Y.S.2d 705, 706 (1980)(the best interest of the child should prevail when only failure to comply with ICPC stands in the way). *See also In Re Petition to Adopt: C.M.A.*, 557 N.W.2d 353, 357–58 (Minn.App.1996)(unknowing violation of the ICPC does not provide an adequate basis for vacating the adoption).

 Although we still do not adopt the *In Re Matter of Adoption T.M.M.* analysis, as it does not discuss the best interest of the child standard, we do not rule out the possibility of a trial court, under appropriate circumstances, dismissing an adoption petition as a violation of the ICPC. Certainly, the best interest of the child remains the overarching consideration and the needs of the child should not be subordinate to enforcement of the ICPC. That determination should be informed by relevant factors, which, although we do not think they are applicable to this case, might include those articulated by the Court of Special Appeals:

> Some of the factors that a trial court should take into consideration are whether the violation (1) was knowingly committed by the adoptive parents or their attorney; (2) impaired the rights of a natural parent; (3) was more than a mere procedural technicality that adversely affected both the receiving and sending state's ability to determine the best interests of the child; (4) impeded the sending state's jurisdiction to determine the best interests of their children; (5) circumvented a sending state's laws in order to effectuate the adoption; (6) was made to enhance the adoptive parent's ability to form emotional ties with the child in order to dictate adoption in receiving state's courts.

*In Re Adoption/Guardianship No. 3598,* 109 Md.App. at 503, 675 A.2d at 184.

## V.

 In adoption cases, the "golden rule" has always been the best interest of the child. *Beckman v. Boggs,* 337 Md. 688, 692, 655 A.2d 901, 903 (1995); *Petrini v. Petrini,* 336 Md. 453, 469–70, 648 A.2d 1016 (1994); *In re Adoption No. 10941,* 335 Md. 99, 113, 642 A.2d 201 (1994); *In re Adoption No. A91–71A,* 334 Md. 538, 561, 640 A.2d 1085 (1994); *In Re Adoption No. 10087,* 324 Md. 394, 411, 597 A.2d 456 (1991); *In re Lynn M.,* 312 Md. 461, 463, 540 A.2d 799, 800 (1988); *Wash. Co. Dep't Soc. Serv. v. Clark,* 296 Md. 190, 200, 461 A.2d 1077 (1983); *Lippy v. Breidenstein,* 249 Md. 415, 420, 240 A.2d 251 (1968); *Beltran v. Heim,* 248 Md. 397, 401, 236 A.2d 723,

(1968); *Walker v. Gardner*, 221 Md. 280, 284, 157 A.2d 273, (1960); *Crump v. Montgomery*, 220 Md. 515, 525, 154 A.2d 802, (1959), *aff'd*, 224 Md. 470, 168 A.2d 355 (1961); P*etition of Johnson*, 247 Md. 563, 569, 233 A.2d 779 (1967); *King v. Shandrowski*, 218 Md. 38, 43, 145 A.2d 281 (1958); *Winter v. Director*, 217 Md. 391, 143 A.2d 81, *cert. denied*, 358 U.S. 912, 79 S.Ct. 242, 3 L.Ed.2d 233 (1958); *Anderson v. Barkman*, 195 Md. 94, 97, 72 A.2d 709, 710 (1950); *Falck v. Chadwick*, 190 Md. 461, 467, 59 A.2d 187, 190 (1948); *White v. Seward*, 187 Md. 43, 48 A.2d 335, 337 (1946); *Dietrich v. Anderson*, 185 Md. 103, 116, 43 A.2d 186, 191 (1945). As we have recently stated:

> [T]he controlling factor, or guiding principle, in both custody and adoption cases is not the natural parents' interest in raising the child, but rather what best serves the interest of the child; the paramount consideration is what will best promote the child's welfare, a consideration that is of "transcendent importance." [16]

*Petrini*, 336 Md. at 469–70, 648 A.2d at 1023 (quoting *In re Adoption No. 10941*, 335 Md. at 113, 642 A.2d 201.)

 Certainly, the right of the parent to rear the child is "an important, natural and legal right." *In Re Jessica M.*, 312 Md. 93, 113, 538 A.2d 305, 315 (1988)(*quoting Radford v. Matczuk*, 223 Md. 483, 488, 164 A.2d 904 (1960) (*quoting* 2 Nelson Divorce § 15.26 (2d ed.1945))). Indeed, in Maryland, we have recognized that there exists "a *prima facie* presumption that the child's welfare will be best subserved in the care

---

**16.** Similarly, the United States Supreme Court explained in *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993–94, 77 L.Ed.2d 614 (1983):

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie (footnotes omitted).

and custody of its parents." *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463 (1952)(italics in original). *See Sider v. Sider,* 334 Md. 512, 639 A.2d 1076 (1994). "The justification for this presumption is the belief that the parent's natural affection for the child creates a great[ ] desire and effort to properly care for and rear the child." *In Re Adoption No. A91–71A,* 334 Md. at 560, 640 A.2d 1085(citing *Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387 (1959)). The rights of parents, therefore, are inextricably linked to the performance of parental duties.[17] Consequently, in adoption cases, the adage that "parents know best" may be rebutted by evidence of unfitness or exceptional circumstances, and, when weighed against the best interest of the child, parental rights may be trumped.

> [W]here an adoption petition by a third party is opposed by a natural parent, a presumption that it is in the child's best interest to maintain the legal relationship with the natural parent may be rebutted by evidence of unfitness or exceptional circumstances that would render a decision in favor of the parent detrimental to the child.

*In Re Adoption No A91–71A,* 334 Md. at 561, 640 A.2d 1085 (citing *Winter,* 217 Md. at 396, 143 A.2d 81). Factors which would constitute "exceptional circumstances" include:

---

**17.** One Commentator has aptly noted:

> Constitutional protection for a parent's right to maintain a relationship with his or her child does not derive from some kind of parental possessory right existing in a vacuum. Rather, the protection is inextricably entwined with the parent's constant responsibility to care for the child. The relationship is truly one of rights and responsibilities. Parents have the "right, coupled with the high duty, to prepare their children for additional obligations which the state can neither supply nor hinder." In earlier times, the law focused much more on parents' legal rights than on their legal duties. More recently, however, the legal right has been considered much more dependent on performance of the legal duty. Thus, the emphasis of the law has moved from the position that children are dependent on their parents' good will for their very sustenance and parents have a concomitant absolute power over their children to the position that children ought to be cared for by their parents and parents have a concomitant legal obligation to provide care.

Elizabeth Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson,* 45 Ohio St. L.J. 313, 319–20 (1984)(footnotes omitted).

the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, and the stability and certainty as to the child's future in the custody of the parent.

*In Re Adoption No. A91–71A,* 334 Md. at 561–62, 640 A.2d 1085.

■ To effectuate an adoption over the objection of a natural parent, § 5–312 of the Family Law Article governs. It provides that a court may grant a decree of adoption to a person who has had custody of the child for at least six months, if by clear and convincing evidence the court finds that:

(1) it is in the best interest of the child to terminate the natural parent's rights as to the child;

(2) the child has been out of the custody of the natural parent for at least 1 year;

(3) the child has developed significant feelings toward and emotional ties with the petitioner; and

(4) the natural parent:

(i) has not maintained meaningful contact with the child during the time the petitioner has had custody despite the opportunity to do so;

(ii) has repeatedly failed to contribute to the physical care and support of the child although financially able to do so;

(iii) has been convicted of child abuse of the child; or

(iv) has been:

(1) convicted of a crime of violence . . .; and

(2) sentenced to a term of imprisonment, for at least 10 years. . . .

The "determination" of a child's best interest is to be made as of the time the adoption decision is made, no earlier. *Crump, supra,* 220 Md. at 525, 154 A.2d at 808.

 The trial court in this case found that, applying the criteria set forth in § 5–312, it was in the best interest of Baby Girl S that she remain with the petitioners. The court noted that Baby Girl S, who was two years old at the time of trial, had never been in the custody of the respondent. The court found further that, based primarily on the testimony of the court-appointed social worker, with whom the respondent failed to schedule a meeting, the petitioners were "fit and proper parents," and Baby Girl S. had developed emotional ties with them, they being the only parents she has ever known. The trial court thus concluded

> There is no question in our mind that it is in the best interests of the child that she remain with [the petitioners]. They are well qualified to fulfill the role of parents, are eager to do so, and have the intellectual, emotional and financial wherewithal to complete that task. [The respondent] on the other hand in our judgment is emotionally immature and has no real concept as to the responsibilities of parenting a child. He is caught up with the concept that it reflects upon his manhood if he does not parent the child.... He believes it will be fun to be a parent. He has grandiose ideas as to how he will advance and how he will be able to provide a home for this child. In fact, he has done little to think through the process of being physically as well as financially responsible for the child.

The trial court then addressed whether the respondent had maintained meaningful contact with Baby Girl S and whether he contributed to the care of Baby Girl S. As to that, the court opined:

> [W]hen made aware that Amy had conceived a child, Jerry C. had the opportunity to start maintaining contacts and developing a relationship to allow himself to be in touch with the child. He did not maintain significant contact with Amy during the pregnancy. We find as a fact that he only took

her to the doctor twice and did not pay for, or offer to pay for, any of the medical services. He took her to his home on one occasion but left her in a crowded home with persons who were strangers to her without advising her he was leaving and without leaving any messages as to where he was going. This only added to her belief that he could not be trusted to provide a stable environment for her and the child. He did not participate with Amy S. to develop any plans for the care, nurturing, development and parenting of [the] child. He made no effort to have any contact with the mother and child between the time he was confronted at the hospital on May 5, 1992 and sometime in August of 1992 when he first learned that the child was not with Amy S. He filed a petition for paternity or filiation but never filed a petition for custody or visitation until March of 1994. He evaded service of process until he could obtain his order of filiation. He was more interested in pursuing the legal gamesmanship than he was in making actual contact with the child. He did not cooperate with court appointed social worker to allow himself to be evaluated so that she could make judgments about the impact on the child if the child was returned to him.

\* \* \* \*

[The respondent] has alternatively claimed an ability to provide properly for the child and to be indigent. In fact, he has provided nothing toward the financial support of the child or toward the physical care of the child. He has provided nothing toward the pre-natal support of [the natural mother] or to support her during her confinement.

\* \* \* \*

We find by clear and convincing evidence that [the respondent] has not maintained any meaningful contact with the child and that he has failed to contribute to the physical care and support to the child although he was financially able to do so.

Despite this finding being well-supported by the record,[18] the Court of Special Appeals held that the trial court did not adhere to a limitation the Legislature placed on the evaluation of the criteria set forth in § 5–312(b). 109 Md.App. at 513, 675 A.2d at 188–89. The limitation to which the court referred is set out in § 5–312(d), which, as pertinent, provides:

(d) *Limitation.*—A court may not grant a decree of adoption under this section solely because a natural parent:

\* \* \* \*

(2) has been deprived of custody of the child by the act of the other natural parent.

As the Court of Special Appeals acknowledged, the trial court did address this limitation.

[The respondent] did not ask [the natural mother] for custody. [The respondent] made no arrangements with [the natural mother] for the support of the child. [The natural mother] decided that she had to take steps to take care of this child since [the respondent] was showing no willingness to provide for the child. She consulted her social worker and decided upon a plan of adoption. [The respondent] left [the natural mother] to depend upon public assistance and herself to take care of this child. Therefore, [the natural mother] was not acting to deprive [the respondent] of contact when she made a decision to place the child for adoption. She was acting in a responsible way under a difficult set of circumstances to provide for this child. [The respondent] up to this point has acted irresponsibly by not

---

18. The trial court also made a specific finding of exceptional circumstances.

> We find that there are exceptional circumstances why the child should not be turned over to her biological father which include his failure to develop a plan for the care of the child prior to the child's birth, his failure to provide for medical care for the mother prior to the child's birth, his failure to provide care and support for the child since the time of its birth, his lack of capacity to meet the needs of the child and the fact that the child is well bonded to the petitioners and has no bond to the respondent.

formulating plans to care for the child and not having provided any assistance to [the natural mother] during her pregnancy. [The respondent] did not request custody or offer to care for the child himself.

\* \* \* \*

Under the circumstances [natural mother] made a reasonable decision to care for th[e] child's needs. That decision impacted upon [respondent's] future access to the child. However, [the respondent] had abandoned his rights to make demands when he failed to step forward to help care for the child's needs on a prenatal basis as well as after it was born.

The Court of Special Appeals determined, however, that the findings of the trial court set forth above merely support the conclusion that the natural mother was justified in putting Baby Girl S up for adoption; however, "they do not justify the natural mother's deceiving the New York Compact Administrator and the Surrogate's Court as to the identity of the [respondent] as the child's father." The Court of Special Appeals found that the respondent did not abandon his right as a parent. In fact, it points out, it was the natural mother, not the respondent, who became "aloof" two months prior to Baby Girl S.'s birth. Then the intermediate appellate court notes that the natural mother testified that she did not want to see respondent during the later months of the pregnancy, and that on numerous occasions, when the respondent attempted to visit the natural mother, he invariably was turned away by the natural mother's parents. Moreover the court further observed, as soon as respondent heard of Baby Girl S's birth, he attempted to visit the child and the natural mother, but was escorted out of the hospital by security guards. Also, it states, while many fathers in similar circumstances would deny paternity, the respondent filed a paternity action, seeking a declaration that he was natural father and thereby had rights to the child.

 The intermediate appellate court clearly pointed to facts in the record that are contrary to the findings of the trial court. However, as a reviewing court, its role is to assess the sufficiency of the evidence, not embark on an independent fact-finding mission and substitute its judgment for that of the trial judge. It is the trial judge's role to assess the evidence and the credibility of witnesses, and to resolve the conflicting evidence. His factual findings should not be disturbed unless they are clearly erroneous. Here, it is crystalline that no such error occurred. *Wamsley v. Wamsley,* 333 Md. 454, 462, 635 A.2d 1322, 1326 (1994); *Larmore v. Larmore,* 241 Md. 586, 589, 217 A.2d 338, 339 (1966); *Kerber v. Kerber,* 240 Md. 312, 316–17, 214 A.2d 164, 166–67 (1965); *Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.,* 92 Md.App. 267, 274, 607 A.2d 584, 588, *cert denied,* 328 Md. 237, 614 A.2d 83 (1992); Maryland Rule 8–131(c).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.